**J. B. TAYLOR et al., Plaintiffs,**

v.

**E. P. PERINI, Supt., et al., Defendants.**

**Civ. No. C69–275.**

United States District Court,
N. D. Ohio, W. D.

July 20, 1978.

Richard S. Walinski, Chief Counsel, Columbus, Ohio, for George F. Denton.

Cary Rodman Cooper, Toledo, Ohio, Special Counsel, for E. P. Perini.

Niki Z. Schwartz, Cleveland, Ohio, for plaintiffs.

## AGREEMENT AND ORDER

DON J. YOUNG, District Judge.

WHEREAS, the plaintiff class consists of all persons who are incarcerated in Marion Correctional Institution at the present time or in the future; and

WHEREAS, Defendant E. P. Perini (hereinafter referred to as the Superintendent) is Superintendent of the Marion Correctional Institution, Ohio Department of Rehabilitation and Correction; and

WHEREAS, Defendant E. P. Perini through his counsel prior to trial on merits waived hearing and Findings of Fact and Conclusions of Law and all issues covered by the Order of September 12, 1972; and

WHEREAS, Defendant George F. Denton (hereinafter referred to as the Director) over objection was joined as a party defendant by Order dated March 1, 1976 for the purpose of implementing the Order of September 12, 1972 and supplemental orders; and

WHEREAS, the Special Master appointed by Order dated December 1, 1975 has found that the defendants are in substantial compliance with the spirit and intent of the September 12, 1972 Order and that, as anticipated by that Order, certain of its provisions are in need of modification.

IT IS AGREED AND THE COURT SO ORDERS THAT:

1. This Agreement supersedes the Order of September 12, 1972 and subsequent orders supplementing its provisions and all such orders are hereby wholly abrogated;

2. This Agreement is entered to adjust, settle and compromise the claims made in Plaintiffs' Second Amended Complaint and is entered in lieu of any Findings of Fact or Conclusions of Law with respect to Plaintiffs' allegations;

3. It is understood that the practices, procedures and standards prescribed below are such as have been negotiated between the parties and in no way represent a judicial determination of practices, procedures or standards required by the Constitution of the United States or of the State of Ohio.

IT IS FURTHER AGREED AND THE COURT SO ORDERS THAT the defendants, their employees, agents, successors, assigns and all those in concert therewith will:

4. Unless pursuant to a warrant issued by a Court of competent jurisdiction, refrain from obstructing, censoring, reading, copying, or delaying legal mail which consists of mail between any of the members of the plaintiff class and any court of law, attorney-at-law, public service law office,

law school legal clinic, or any office or official of the federal, state or local government; refrain from opening or inspecting any such legal mail from or to any member of the plaintiff class except where conducted in the presence of the recipient for the limited purpose of detecting contraband. In the event that any such legal mail from or to any member of the plaintiff class is opened or inspected inadvertently outside the presence of the recipient, the Superintendent shall notify the sender and addressee of such mail in writing of the error.

5. Refrain from interfering with, or inhibiting by imposition of sanctions, or harassment, efforts by members or the plaintiff class to assist one another in the preparation and conduct or defense of actions in any court of law involving the adjudication of the legal rights, privileges, or immunities of the assisted member of the plaintiff class. The defendants shall afford plaintiffs so desiring to work together a reasonable place to do so, but may limit such activity to non-working hours. In addition, the defendants shall maintain separate collections of law books in both the Stockade and the Honor Dormitory at Marion Correctional Institution and will make such law books available during reasonable hours to members of the plaintiff class. Each collection shall include, at a minimum, the following books:

*Federal Materials*

1. United States Code Annotated. St. Paul: West. Constitution; Titles 18; 28 (Secs. 2241–2255, Federal Rules of Appellate Procedure, Rules of Supreme Court, Federal Rules of Evidence); 42 (Secs. 1981–1985).

2. Supreme Court Reporter. St. Paul: West. Vol. 80– (1960 to date).

3. Federal Reporter (2nd series). St. Paul: West. Vol. 273– (1960 to date).

4. Federal Supplement. St. Paul: West. Vol. 180– (1960 to date).

5. Shepard's United States Citations. Colorado Springs: Shepard, 1968.

6. Shepard's Federal Citations. Colorado Springs: Shepard. Federal Supplement; Federal Reporter, 2d Series.

7. Rules of local federal district courts.

*State Materials*

1. North Eastern Reporter (2nd series) (Ohio cases). St. Paul: West. Vol. 159– (1960 to date).

2. Page's Ohio Revised Code Annotated. Cincinnati: W. H. Anderson, Appendix, Civil Rules, Titles 1, 19, 21, 23, 25–27, 37, 29, 51–53, all with current supplements.

3. Shepard's Ohio Citations Cases and Statutes. Colorado Springs: Shepard.

4. Schroeder-Katz Ohio Criminal Law Practice and Forms. Cleveland: Banks-Baldwin.

5. Criminal Law Reporter. Washington, D.C.: Bureau of National Affairs. Weekly.

*General Materials*

1. Complete Manual of Criminal Forms, Federal and State, Bailey, F. Lee and Rothblatt, Henry B., Rochester: Lawyers Cooperative, 1968.

2. Black's Law Dictionary; Black, Henry C. (latest ed.) St. Paul: West.

3. Legal Research in a Nutshell (latest ed.); Cohen, Morris L., St. Paul: West.

4. Criminal Procedure in a Nutshell, Israel, Jerold H. and LaFave, Wayne R. St. Paul: West.

5. Federal Habeas Corpus (latest ed.). Sokol, Ronald P. Charlottesville, Va.: Michie.

6. Constitutional Rights of Prisoners; Palmer, John W. (current supplement); Cincinnati: Anderson.

The defendants shall assign at least three inmate law library clerks in the main stockade at Marion Correctional Institution (hereinafter referred to as the Stockade) and at least two inmate law library clerks in the Honor Dormitory of Marion Correc-

tional Institution (hereinafter referred to as the Honor Dormitory) to assist other members of the plaintiff class in conducting legal research, and shall provide such inmate law library clerks with reasonable office supplies.

6. Provide to any member of the plaintiff class without charge, or on credit, paper, pencils, pens, notarial services, and postage (including certified mail and special delivery charges) for use in the preparation and mailing of documents and correspondence pertaining to legal proceedings involving the adjudication of the rights, privileges, or immunities of said member of the plaintiff class. In addition, the defendants shall make available photocopy service for the copying of such documents and correspondence at a price not exceeding that charged by commercial photocopy services in the City of Marion, Ohio.

7. Permit members of the plaintiff class without restriction to receive, possess and read printed materials addressed to them as individuals including newspapers, magazines, pamphlets, books, photographs, whether or not of persons known or related to the inmate, drawings, and pre-recorded magnetic tapes, with the exception of individual publications which either are obscene or inflammatory. In order to be regarded as obscene or as inflammatory, printed material must be subject to exclusion under the following standards and procedures:

(a) Definitions

(1) "Contemporary community standards" means the standards prevalent in the social environment of an urban center, such as Columbus, Cincinnati or Cleveland, with their range of literature and magazines which are available to the general adult public.

(2) "Taken as a whole" means viewed in its entirety. It does not refer to an isolated depiction or description.

(3) "Serious literary, artistic, political, or scientific value" means a substantial value which is not merely a contrivance designed to protect otherwise obscene material.

(4) "Prurient interest" means an interest in that which is lewd or lustful.

(5) "Patently offensive" means a depiction or description, which is a graphic or explicit portrayal of the naked penis or vagina.

(b) In the interest of health or safety the Superintendent may establish and post regulations reasonably limiting the maximum amount of printed material which may be retained by an inmate. Such regulations shall be forwarded to the Director for review and approval.

(c) Printed material may be excluded from the Institution for one or both of the following reasons:

(1) The printed material is obscene. In order to be considered obscene and thus subject to exclusion, printed material must meet all the following three standards, which shall be considered in the order stated below.

(a) The printed material depicts or describes, in a patently offensive way, conduct falling within one or more of the following categories:

(i) Nudity emphasizing a state of sexual arousal or stimulation; for example, a male erection or graphic exposure of the clitoris.

(ii) Nudity emphasizing masturbatory activity.

(iii) Portrayal of explicit sexual acts, heterosexual or homosexual, including vaginal, anal, oral, and manual acts.

(iv) Portrayal of acts of bestiality; that is, sexual relations between human being and an animal.

(v) Portrayal of acts of sado-masochism emphasizing the infliction of pain.

(vi) Portrayal of an excretory function.

(b) The average person, applying contemporary community standards, would find that the printed material, taken as a whole, appeals to the prurient interest.

(c) The printed material, taken as a whole, lacks serious literary, artistic, political, or scientific value.

(2) The printed material is inflammatory; that is, the presence of the printed material in the institution would constitute a clear and present danger to the security or safety of the institution. No publication shall be considered inflammatory solely on the basis of its appeal to a particular ethnic, racial, or religious audience. In order to constitute a clear and present danger to the security or safety of the institution, the printed material must meet at least one of the following criteria:

(a) Printed material which incites, aids, or abets criminal activity, such as rioting or illegal drug use.

(b) Printed material which incites, aids or abets physical violence against others, including instruction in making, using, or converting weapons.

(c) Printed material which incites, aids, or abets escape, such as instruction in picking locks or digging tunnels.

(d) No printed material shall be excluded under the above stated standard except by majority vote of an institutional Publications Review Committee consisting of three or more persons not more than one of whom shall have primary responsibility in the area of custody. The following procedures shall be observed in all cases:

(1) The inmate/addressee shall receive notice of the interim prohibition of intercepted printed material on the working day following initial arrival of the printed material at the institution;

(2) The notice to the inmate/addressee shall state the reason for the interim prohibition and inform him of his right to an appearance before the Publications Review Committee;

(3) The Publications Review Committee shall meet on a weekly basis and any inmate wishing to appear before the Committee may do so at the meeting following the institution's receipt of the printed material in question;

(4) The Publications Review Committee shall render a decision on the date of its consideration of the printed material in question and shall provide the

affected inmate with written notice of the decision and the reason therefor on the following working day;

(5) In the event of a decision to exclude printed material, the inmate shall be notified of his right to appeal to the Department of Rehabilitation and Correction, and the Department shall provide the affected inmate with notice of the decision on appeal within 28 working days of the receipt of the appeal;

(6) The institutional Publications Review Committee shall maintain records of all Committee proceedings for at least one year following the decision of the Committee, none of which records shall be placed, or referred to, in any inmate's file.

(e) Any list of prohibited printed materials promulgated by the Department of Rehabilitation and Correction shall not apply to printed material received by inmates at Marion Correctional Institution and shall not be considered by the institutional Publications Review Committee in making its decisions.

8. Refrain from imposing any disciplinary sanctions on, or making any adverse disciplinary record references regarding, any member of the plaintiff class except for the violation of written regulations sufficiently definite and specific and sufficiently distributed and/or posted to provide each member of the plaintiff class with fair notice of what conduct is prohibited and of the permissible range of sanctions for each such violation. For this purpose, the defendants shall publish and distribute to all members of the plaintiff class a manual containing notice of conduct which is prohibited generally and the permissible range of sanctions for each such violation. The defendants shall revise the contents of these manuals as necessary to reflect current rules and regulations. In addition, specific rules and sanctions relating thereto affecting particular groups of inmates or particular areas of the prison shall be posted prominently in such a way as to provide notice to affected inmates. A verbatim copy of this Order shall be printed in the manual referred to in this paragraph.

9. Refrain from imposing solitary confinement, punitive segregation, or correctional cell incarceration on any member of the plaintiff class unless consistent with the following conditions:

(a) Such incarceration shall be for a fixed term not to exceed 15 consecutive days, nor shall any inmate be subjected to more than a total of 30 days of such incarceration during any six month period; provided, however, that the 15 and 30 day limitations shall not apply to inmates whose transfer to another correctional institution has been approved by the Department of Rehabilitation and Correction;

(b) Normal institution meals (excepting only desserts) shall be provided;

(c) Adequate clothing, bedding, toilet facilities, and toilet articles (including soap, toothbrush, toothpaste, and shaving gear) shall be provided;

(d) Normal medical care shall be provided, and a medically trained member of the medical staff shall make rounds through the correctional cell area at least once during the course of the first and second employment shifts; in addition, all prescription drugs shall be dispensed by medical personnel;

(e) A reasonable number of books of the inmate's selection subject to general institution rules governing reading matter shall be permitted or provided;

(f) Inmates enrolled in an educational course shall be permitted to have their textbooks;

(g) Normal mail privileges shall be permitted;

(h) Clergymen, social services personnel and attorneys shall be permitted access during reasonable hours to inmates so incarcerated;

(i) Adequate light for reading in the daytime and adequate darkness for sleeping at night shall be provided;

(j) Opportunity for exercise shall be provided not less than once every third day;

(k) Except for brief, temporary absence, a correctional officer or other staff member shall be present inside the correctional cell area at all times unless an emergency requires his absence; such correctional officer or staff member shall visually inspect all occupied correctional cells at least once every 30 minutes.

10. Employ a full-time Job Counselor for the purpose of coordinating all inmate job assignments within Marion Correctional Institution. All such assignments shall be made in accordance with the following procedures:

(a) *The Job Assignment Committees*

(1) In the stockade, initial job assignments shall be made by the Classification Committee. The Classification Committee shall be composed of the Associate Superintendent for Treatment or his designee, who will serve as chairman, the Inmate Personnel Officer, the Director of Psychological Services or his designee, and a representative from the Education Department. The Job Counselor shall be a non-voting member of the Classification Committee.

In the Honor Dormitory, initial job assignments shall be made by the Honor Dormitory Placement Committee. The Honor Dormitory Placement Committee shall be composed of the Associate Superintendent for Treatment or his designee, who will serve as chairman, the Inmate Personnel Officer, and the Director of Psychological Services or his designee. The Job Counselor shall be a non-voting member of the Honor Dormitory Placement Committee.

(2) In the stockade, job transfers shall be made by the Reclassification Committee. The Reclassification Committee shall be composed of the Associate Superintendent for Treatment, who shall serve as chairman, the Inmate Personnel Officer, a representative from Psychological Services, and a representative from Social Services. The Job Counselor shall be a non-voting member of the Reclassification Committee.

In the Honor Dormitory, job transfers will be made by the Honor Dormitory Reclassification Committee. This Com-

mittee shall be composed of the Administrative Assistant to the Superintendent, the Inmate Personnel Officer, a representative from Psychological Services, and a representative from Social Services. The Job Counselor shall be a non-voting member of the Honor Dormitory Reclassification Committee.

(3) The Job Counselor shall report all job vacancies as they occur to the appropriate job assignment committee.

(4) These committees shall report directly to the Superintendent. The function of the job assignment committees shall be to make all initial job assignments and reassignments in the honor dormitory and the stockade.

(b) *Initial Assignments*

(1) The Classification Committee and Honor Dormitory Placement Committee shall make initial assignments of inmates to individual jobs in shops rather than to the shops for individual assignment by job supervisors, and no ·job supervisor shall assign an inmate to a job other than the one designated by the job assignment committee. The decisions of the job assignment committees shall be made on the basis of information from the Job Description Manual and with the advice of the Job Counselor, whose duty it shall be to keep these committees informed of the content of all jobs in the prison and what jobs are available for initial assignment to inmates. An inmate need not be assigned to a specific job if such inmate is selected for an education program.

(2) During the inmate orientation period and prior to an inmate's initial assignment in the stockade, the Job Counselor shall meet with the inmate and be responsible for explaining to him the content of individual jobs and the job assignment system. The Job Counselor shall also obtain the abilities, qualifications and job goals of every incoming inmate. The Job Counselor shall have the authority to gain access to all available information on an inmate ·including that developed through the inmate classification process utilized by the Department of Rehabilitation and Correction. The Job Counselor shall keep a record of all interviews with income inmates.

(3) The Classification Committee and the Honor Dormitory Placement Committee shall keep records of all decisions as to initial job assignments, including votes as to the assignment of inmates, if such are necessary. These records shall be kept in the office of the Job Counselor.

(c) *Intra-Shop Transfers*

(1) A job supervisor shall have the authority to fill a position within his shop or job category from one job to another but only on the basis of the procedure outlined in this part (c). However, this procedure shall not apply to the filling of any jobs in the stockade which require honor or semi-honor status nor to any jobs in the honor dormitory designated as special security positions. All stockade honor and semi-honor status jobs and all honor dormitory special security job vacancies shall be filled in accordance with the procedure outlined in part (g) below.

(2) All job vacancies in a shop with respect to which the job supervisor wishes to make an ·intra-shop transfer, other than temporary vacancies as defined below, must be posted by the job supervisor in a central place in the shop for at least three days, and job bid forms must be readily available to all inmates in the shop.

(3) All inmates in the shop in which the vacancy has occurred shall be allowed to bid on the job by completing a job bid form prepared by the Job Counselor and submitting it to the Job Counselor or job supervisor.

(4) After the three day posting period, the job supervisor shall have the authority to choose an inmate from the five inmates with most prison seniority (as defined in part (e) below) who have bid on the job. If the job supervisor chooses such an inmate, the decision of the job supervisor shall be posted in the shop for not less than the next five working days.

(5) Copies of the original posting notice, all applications and the decision of the job supervisor shall be sent to the Job Counselor who shall report the vacancy, bids and decision of the job supervisor to the appropriate job assignment committee. The decision of the job supervisor shall become final if the appropriate job assignment committee takes no contrary action within two weeks or if the Superintendent does not disapprove of the assignment for security reasons. In the interim, the job supervisor shall have the authority to fill the vacancy with the inmate whom the job supervisor has chosen.

(6) The job supervisor shall not have the authority to fill any position within his shop with any inmate who works under another job supervisor or in another shop. The job supervisor shall make no inter-shop transfer of inmates.

(7) Temporary vacancies shall be filled at the discretion of the job supervisor by any inmate within his shop. A "temporary vacancy" shall be deemed to exist where an inmate presently holding a position is unable to perform his duties for 20 calendar days or less due to such occurrences as a furlough, an illness, the filling of another temporary vacancy, an emergency, or the like. Job supervisors shall keep records of all temporary transfers. If a temporary vacancy should last for more than 20 calendar days, the job supervisor shall notify the Job Counselor, who shall notify the appropriate job assignment committee. That job assignment committee then shall have the authority to determine whether or not the vacancy is temporary or permanent at its next regularly scheduled meeting. If the job assignment committee determines that the vacancy is permanent, the vacancy shall be filled under the procedure outlined in this part (c) or in part (d) below.

(d) *Inter-Shop Transfers*

(1) If a job supervisor is unable to or does not wish to fill a permanent vacancy from within his shop, he shall immediately notify the Job Counselor. The job supervisor shall be prohibited from making any inter-shop transfers on his own or from requesting individuals from another shop or from making requests for individuals to any job assignment committee. All inter-shop transfers shall be made exclusively under this part (d) except for the assignment of jobs requiring honor or semi-honor status in the stockade and jobs designated special security in the honor dormitory. These categories of jobs shall be filled in accordance with part (g) below.

(2) Upon receipt of the notice, the Job Counselor shall post information concerning the vacancy on the next regularly scheduled working day in a central location or central locations which will inform all inmates of the opening. In addition, the information as to the opening should contain a detailed job description analysis or a reference to the Job Description Manual, which shall be readily available to all inmates. This vacancy notice shall be posted for at least three working days. All inmates shall be allowed to apply for the position on written application forms readily available to them and shall be submitted to the Job Counselor. The appropriate job assignment committee shall choose an inmate to fill the position from the top five senior inmates in prison seniority (as defined in part (e) below) who have applied, unless the job has been designated as a "skilled" job. If a job is designated as a skilled position in the Job Description Manual, the job assignment committee shall have the authority to choose an individual from outside the top five senior applicants. In such a case, however, the job assignment committee shall specifically state in its records why the job constitutes a skilled position and the reasons for selecting the particular inmate. In determining who shall fill a job, the job assignment committee shall review all records and qualifications of all applicants whom it is considering. It shall have the authority to hear witnesses. It shall obtain the advice of the Job Counselor. In all cases the decision of

the job assignment committee as to who shall be assigned the job shall be posted in all designated central locations and a copy of such decision shall be sent to the affected job supervisor. All records shall be transmitted to and kept by the Job Counselor.

(3) In regard to any inter-shop transfer, no job supervisor, on his own initiative, shall attempt to influence or interfere with a decision of the job assignment committees, unless the job assignment committee or the Job Counselor first seeks the opinion of the job supervisor.

(4) If no inmate applies for the position and the vacancy is an entry level job, the Classification Committee or the Honor Dormitory Placement Committee shall fill the position with an inmate needing an initial assignment. If the job is not an entry level job, the information concerning the vacancy shall be reposted by the Job Counselor. If no one applies for the vacancy during the second posting period, the Reclassification Committee or the Honor Dormitory Reclassification Committee shall have the authority for a reasonable period of time to fill the position. The Job Counselor shall advise these committees in their selection process.

(5) Any inmate may bid for a job posted by the Job Counselor, but preference may be given to inmates who have been on their current job for a period of 90 days.

(e) "Prison seniority" or "seniority" as those terms are used in the assignment of inmates to jobs shall be defined in regard to inmates in the stockade as the length of time spent at Marion Correctional Institution for the term of incarceration presently being served. In the case of parole violators, prison seniority will accrue from the date of reincarceration at Marion Correctional Institution. In regard to inmates assigned to the honor dormitory, "prison seniority" or "seniority" shall be defined as the length of time spent at the honor dormitory at Marion Correctional Institution for the term of incarceration presently being served unless the period of time served in the honor dormitory has been interrupted and, in the judgment of the Job Counselor, the interruption should cause the accumulation of seniority to commence with the inmate's reassignment to the honor dormitory.

(f) *Race*

(1) All shops employing four or more inmates and job categories employing four or more inmates within shops, as determined in the Job Description Manual, shall reflect the racial makeup of the prison population as nearly as possible within a 20% allowable deviation.

(2) The job assignment committees shall be responsible to see that these racial goals are accomplished and that no segregation on the basis of race exists in any job assignments. The job assignment committees shall retain reports of the racial breakdown in shops and job categories for use in all of their deliberations.

(3) The job assignment committees shall receive reports of racial breakdown in shops and job categories on no less than a quarterly basis from all job supervisors. If a job assignment committee finds that a pattern of racial discrimination exists, the committee shall have the authority to hold hearings, review records, and make affirmative decisions to eliminate all vestiges of racial discrimination in shops or job assignments.

(g) *Special Assignments*

(1) Any job in the stockade which requires honor or semi-honor status and any job in the honor dormitory which constitutes a special security position shall be filled by the Job Counselor in accordance with part (d) of these job assignment procedures except that the Superintendent must approve the assignment before it is effected.

(2) The Superintendent or his designee shall determine which jobs in the stockade require honor or semi-honor status and which jobs in the honor dormitory constitute special security positions.

(h) *Other Provisions*

(1) Any job assignment decision or action of a job supervisor or the Job Counselor in connection with a job assignment shall be subject to the inmate grievance procedure.

(2) The honor dormitory and stockade reclassification committees shall review annually every inmate who has worked in a particular shop for one year or more. The purpose of this review shall be to obtain the reactions of the inmate to the particular job and to determine if the job content has changed. Prior to the review, the Job Counselor shall notify the inmate of such and explain to him the purpose of the interview.

(3) The job assignment committees and the Job Counselor shall be responsible for classifying all new jobs and keeping current all job descriptions in the Job Description Manual.

(i) *Sanctions*

(1) Any job supervisor who fails or refuses to follow these guidelines shall be subject to the following disciplinary action by the Superintendent:

a) First Offense: Corrective counseling or a written reprimand which shall be placed in the job supervisor's personnel file.

b) Second Offense: Not less than five days suspension without pay.

c) Third Offense: Removal.

(2) The determination of whether or not a job supervisor has violated any of the provisions of these guidelines shall be made at a hearing of the appropriate reclassification committee. The committee shall notify the job supervisor of the offense with which he has been charged. The job supervisor shall have the opportunity to appear before the committee. The committee shall hear witnesses and obtain all relevant evidence. The decision of the reclassification committee shall be forwarded to the Superintendent, who shall make the final determination.

11. Publish and distribute to all staff members at Marion Correctional Institution a staff manual containing written rules applicable to all staff prohibiting all forms of racial discrimination, harassment, intimidation and insult, coupled with sanctions for their violation ranging from written reprimand to discharge depending upon the severity and repetition of violation. The manual shall include a verbatim copy of this order.

12. Include on all staff job descriptions as well as on all employment application forms utilized by Marion Correctional Institution the following language:

It is the firm policy of the Marion Correctional Institution to maintain a working atmosphere free of any discrimination on the basis of race, sex, religion and national origin. Discriminatory harassment, intimidation, or insult of staff, inmates or visitors to the institution will subject the employee to disciplinary action. The ability and willingness of the employee to abide by this policy and to refrain from such actions are *essential* requirements for employment. The employee's performance with respect to this policy will be evaluated regularly as a major criterion for determining retention and promotion.

13. Require attendance of all incoming staff at an orientation program presenting Marion Correctional Institution's commitment to the principle of racial equality, the fact that the staff member's commitment to this principle is a criterion of hire, retention, promotion and assignment, and the obligations of the institution and each staff member under the Federal Equal Employment Opportunity Act.

14. Refrain from hiring or assigning to duty as a correctional officer at Marion Correctional Institution any person who has not both successfully completed the Marion Correctional Officer Psychological Inventory and as a result thereof been certified as eligible for employment as a correctional officer by the Department of Administrative Services of the State of Ohio. Nothing herein shall prohibit the occasional transfer of correctional officers from other Ohio correctional institutions so long as such trans-

fers are not initiated or encouraged by the defendants in order to avoid the application of this paragraph.

15. Provide a program for in-service training of all correctional officers and of all staff members who have significant direct contact with members of the plaintiff class. The training program shall include training in human relations skills oriented toward the helping role of a correctional staff member and sensitivity to the nature, needs, aspirations and problems of the diverse racial, cultural, and ethnic groups which comprise the inmate population. Every correctional officer and every staff member having significant direct contact with inmates shall receive a minimum of 16 hours of in-service training during the course of each year of employment. A record of each staff member's in-service training shall be maintained in his or her employment file.

16. Provide a program of orientation for incoming inmates on the Marion Correctional Institution's commitment to racial equality, the inmate's responsibility to abide by that principle, the fact that relevant evaluations of him will include his performance in that regard, together with instructions calculated to cultivate understanding of, and sensitivity toward, the nature, needs, aspirations and problems of the diverse racial, cultural, and ethnic groups which comprise both the inmate and staff populations of the institution.

17. Cause the Departmental Chief Inspector to conduct an annual audit of the extent of compliance with the provisions of this Order, to report his findings in writing to the Director, and to maintain a copy of all such reports.

18. Maintain racial balance in the assignment of beds and cells to members of the plaintiff class. The racial balance in each cellblock shall reflect the racial balance in the stockade population, plus or minus 5%; the racial balance in each stockade dormitory other than 2B, 5 and 5E (so long as those dormitories continue to be used to house educational and drug rehabilitation program participants) shall reflect the racial balance of the stockade population, plus or minus 15%; the racial balance in each dormitory in the honor dormitory shall reflect the racial balance of the honor dormitory, plus or minus 15%. The defendants shall be regarded as being in compliance with respect to the assignment of beds in the stockade dormitories other than 2B, 5, and 5E (so long as those dormitories continue to be used to house educational and drug rehabilitation program participants) so long as no more than one such dormitory fails to reflect the racial balance of the stockade population plus or minus 15%. Racial balance with respect to all dormitories and cellblocks shall be measured on a monthly basis by averaging the weekly racial balance for each cellblock and dormitory. Initial assignments to cells and beds shall be made in such a way as to integrate cell rows and dormitory bed rows. Voluntary cell or bed transfers shall be permitted only when such a transfer does not increase racial segregation in a cell row or a stockade or honor dormitory bed row.

19. Refrain from placing in any inmate's file which is available to the Adult Parole Authority any reference or document relating to activities related to the filing of any grievance by that inmate or to any claim that the provisions of this Order have been violated.

20. Refrain from engaging in any act or practice which has the purpose or the effect of discriminating against any member of the plaintiff class because of his race, color, or national origin, except insofar as specifically required by this Agreement.

21. Refrain from engaging in any form of racial harassment, intimidation, or insult against any member of the plaintiff class.

22. Maintain inmate organizations known as Resident Councils both in the honor dormitory and in the main stockade at Marion Correctional Institution. The Stockade Resident Council shall consist of 18 inmate representatives, one from each housing unit to be elected by the inmates in that housing unit in the stockade. The Honor Dormitory Resident Council shall consist of six inmate representatives, three

from each housing unit to be elected by the inmates in that housing unit of the dormitory. One alternate representative shall be elected for each member of the two Councils. In addition, in the event that a representative is transferred from one stockade housing unit to another or from one honor dormitory housing unit to another during his term of office, he shall be entitled to complete that term as a representative at large. The alternate representative in the housing unit from which the representative was transferred shall become the representative for that housing unit for the remainder of the term. Elections shall be held during the first week of February and during the first week of August of each year. Vacancies shall be filled in special elections. Each Council may adopt guidelines for its membership and operation subject to the approval of the Superintendent, who shall provide the Council with a written explanation for any disapproval.

The function of the Councils shall be to study problems relating to the full range of institutional life and to recommend to the Superintendent courses of action to deal with those problems. In addition, the Councils may recommend the development of new programs and/or the adoption of new policies to improve the quality of institutional life. The defendants shall cooperate with the Resident Councils by permitting the Councils and committees thereof to meet on a regular basis, providing reasonable office, meeting, and filing space, providing reasonable office supplies to the Councils and their members and by meeting reasonable Council requests for information and for staff participation. The Superintendent and/or staff members designated by him shall meet on a frequent and regular basis with the Councils or committees thereof. The Superintendent or his designee shall provide the Council with a written response to all written Council recommendations.

The Resident Councils shall be permitted to report their activities, including administrative responses to Council recommendations, to the general population on a regular basis. Such reports may be distributed in the form of an institutional newsletter or newspaper. The defendants shall refrain from engaging in any form of harassment, intimidation or insult against any member of the plaintiff class because of that person's membership on a Resident Council.

23. Appoint a member of the administrative staff at Marion Correctional Institution to serve as Inspector of Institutional Services. The duties of the Inspector of Institutional Services shall be the following:

(a) The Inspector of Institutional Services shall be primarily responsible for:

(1) the inspection of Institutional Services;

(2) the investigation and processing of grievances made by inmates;

(3) the monitoring of the application of Institutional and Departmental rules affecting the services to inmates or the security of the institution;

(4) personally conducting all training of institutional staff on the operation and purposes of the inmate grievance procedure;

(5) personally conducting orientation programs for newly received inmates relative to the purposes and functions of grievance procedures.

(b) The Inspector of Institutional Services shall engage in regular consultation with the Resident Councils referred to in paragraph 22 of this Order.

(c) The Inspector of Institutional Services shall provide the inmate grievant with a written statement of the determination of his grievance and the reason for that determination.

(d) The Inspector of Institutional Services may be given special assignments by the Superintendent or by the Departmental Chief Inspector; however, no such assignment shall be inconsistent with the duties set forth above.

(e) The Inspector of Institutional Services shall have sufficient authority, civilian secretarial assistance, and resources to perform his duties in a confidential, impartial, and effective manner.

(f) The Inspector of Institutional Services shall report directly to the Superintendent and shall also be required to submit all reports, documents, or other forms of accountability of his work to the Departmental Chief Inspector, monthly, or as otherwise required.

(g) The Inspector of Institutional Services shall be an administrative assistant to the Superintendent and shall have the experience and special training needed to perform effectively the duties with which he is charged.

24. Employ an individual to serve as Chief Inspector for the Department of Rehabilitation and Correction pursuant to Administrative Regulation 5120–9–30. The office of the Chief Inspector as well as the duties and authority of that individual shall be as prescribed in that Administrative Regulation including any amendments, except that the duties given the Chief Inspector by this Order shall be limited to Marion Correctional Institution.

25. The defendants shall maintain an effective procedure for the resolution of inmate grievance arising at Marion Correctional Institution. Except as otherwise indicated in this paragraph, a grievance may relate to any aspect of institutional life. It may concern departmental or local institutional policies, procedures, rules and regulations or the application of any of these to the grievant. It may also relate to actions on the part of any staff member or inmate affecting the grievant. A grievance must be specific in its description of the complaint or problems. A grievance filed with the Inspector of Institutional Services must be individual in nature even though other inmates may be similarly affected. The grievance shall not act as an additional or substitute appeal process in connection with the Rules Infraction Board or Institutional Hearing Officer proceedings. A complaint relating to a specific disciplinary decision will not be considered. A complaint alleging punishment for violation of a rule not contained in the Inmate Manual or not properly posted, however, shall be grieva-

ble. In addition, complaints unrelated to institutional life such as legislative action, policies and decisions of the Adult Parole Authority, judicial proceedings and sentencing are not grievances within the scope of this paragraph. No claim involving subject matter exclusively within the jurisdiction of the courts or other agencies will be considered. Any complaint which is partly grievable and partly not grievable under this paragraph shall be considered except to the extent that it is not grievable under this paragraph.

The Superintendent shall install locked mailboxes for inmates at Marion Correctional Institution to mail kites and written requests. Each inmate at Marion Correctional Institution shall receive either a written or an oral response to his kite or written request as soon as possible but in no event more than five working days after receipt by the appropriate staff member or administrator. Normal and routine requests and inquiries shall be handled informally.

Any inmate wishing to file a grievance may do so, in writing or in person, by notifying the Inspector of Institutional Services of the nature of his grievance. The grievance resolution procedure shall be as follows:

(1) Upon notification by an inmate, in writing or in person, of a grievance the Inspector of Institutional Services shall take such actions as are necessary to resolve the grievance and make a brief written description of the grievance and the resolution thereof in a log kept for that purpose. The log shall be maintained for inspection by the Superintendent and the Chief Inspector.

(2) Either the inmate or the Inspector may require that the grievance be stated in detail on a form provided for that purpose. Upon request, the Inspector of Institutional Services will assist in the completion of that form. A copy of the completed form is to be given to the inmate, and the original retained by the Inspector of Institutional Services.

(3) The Inspector of Institutional Services shall conduct all interviews, records re-

search, or other investigation necessary to effect a proper resolution of the grievance. He shall maintain a written record of his investigations as well as his conclusions and recommendations or actions concerning the grievance.

(4) Should the grievance not be resolved by the Inspector of Institutional Services within ten working days, he shall notify the inmate in writing of the reasons for the extension of time with a copy to the Chief Inspector. Any extension of time beyond 30 days must be approved by the Chief Inspector.

(5) If the resolution of the grievance is not within the scope of authority of the Inspector of Institutional Services, he shall submit his findings and recommendations concerning the disposition of the grievance to the Superintendent for his endorsement, modification, or disapproval. Within ten working days, the Superintendent shall respond to the Inspector of Institutional Services.

(6) In all cases the Inspector of Institutional Services shall provide the inmate with written notice of the resolution of his grievance and the reasons for that resolution.

(7) Whenever the inmate is dissatisfied with the resolution of his grievance, he may, within five working days of receipt of written notice of the resolution of his grievance, either appeal in writing to the Chief Inspector upon a form provided for that purpose or seek outside review of his grievance on a form provided for that purpose. If the inmate appeals directly to the Chief Inspector, the latter shall notify the inmate within 20 working days of his decision on appeal. If the Chief Inspector requires additional time, he shall so notify the inmate in writing of the reasons for the extension with a copy to the Director. If the inmate seeks outside review of his grievance, the grievance and the proposed resolution thereof shall be reviewed by a panel of members of an Outside Review Committee. The Outside Review Committee shall consist of persons appointed by the Superin-

tendent, but they shall not be affiliated in any way with the Department of Rehabilitation and Correction. The Outside Review Committee shall have access to any and all parts of the institution and shall have the right to hold hearings, call witnesses, and review records relevant to a grievance. The Outside Review Committee may develop guidelines for its own operation. The findings and recommendations of the Outside Review Committee or any panel thereof shall be in writing and copies of those findings and recommendations shall be forwarded to the Chief Inspector, the Inspector of Institutional Services, and the affected inmate/grievant. All recommendations of the Outside Review Committee or panel thereof shall be advisory only, and the Chief Inspector shall recommend a final resolution of the grievance to the Director. The Chief Inspector shall advise the inmate of the final resolution of such a grievance in the same manner as in other cases, with copies to the Outside Review Committee and the Inspector of Institutional Services. All decisions of the Chief Inspector shall be implemented as promptly as possible.

(8) The Inspector of Institutional Services shall maintain for three years in his office all records relating to each grievance. The Inspector of Institutional Services shall be required to submit monthly reports summarizing his activities to the Superintendent and the Chief Inspector. The form and content of the reports shall be prescribed by the Chief Inspector.

The Inspector of Institutional Services shall have the authority to interview any institutional personnel or inmates necessary to investigate grievances and to determine compliance with departmental and institutional regulations. The Inspector of Institutional Services shall also have access to all relevant records and files.

The Inspector of Institutional Services shall make a continuing survey of all institutional areas to determine compliance with administrative and institutional regulations. The Inspector of Institu-

**1254**

tional Services shall submit a report of his findings to the Superintendent on a monthly basis or more often if necessary.

False accusations and statements by inmates or staff may be the subject of disciplinary action when made in a knowing, deliberate, and malicious attempt to cause significant injury to another party and the potential for such injury is substantiated. The burden of proof in such cases shall always rest with the institution. Failure of an inmate to substantiate his grievance accusations shall not, by itself, be used as grounds to initiate disciplinary action.

26. Before any court will enforce the practices, procedures or standards established by any paragraph of this Order on the ground that they are alleged to have been or are in the process of being violated, the claim of violation must have been presented as a grievance and appealed with or without outside review to the Chief Inspector or, in appropriate cases, filed with him. Regardless of how it is styled, any court action to enforce the practices, procedures or standards established in this Order shall be treated as a motion to show cause for civil rather than criminal contempt or as a motion to enforce the Order. Evidence of the actions and the reasons therefor taken at each step of the Grievance Procedure shall be admissible. If the defendant in any such action is adjudged to be in violation of the practices, procedures or standards established by this Order, the defendant shall be given a reasonable time to purge himself of contempt before sanctions are imposed. If within the reasonable time designated by the court the defendant brings himself into compliance with the practices, procedures or standards established by this Order, no sanctions will attach unless the court finds that the violation was willful, deliberate and in bad faith. It shall be a defense to a claimed violation of this Order that compliance with the particular provisions alleged to have been violated was rendered impracticable by an in-stitution-wide emergency such as a riot or a work stoppage.

IT IS SO ORDERED.

## MEMORANDUM AND ORDER

DON J. YOUNG, District Judge.

This action came to be heard upon the Fifth Report of the Special Master on the Defendants' State of Compliance with the Court's order of September 12, 1972. The parties have filed no objections to that report. The Court being fully advised in the premises, it is ordered that the report is in all respects confirmed. Said report is attached as an appendix hereto, incorporated herein by reference, and made a part hereof as fully for all intents and purposes as if set forth at length herein.

The Court finds that the Defendants are in substantial compliance with the provisions of the Court's order of September 12, 1972. In making this finding the Court wishes to acknowledge the cooperation which has been forthcoming from Director George F. Denton and Superintendent E. P. Perini over the course of the past two and one-half years. In addition, the Court wishes to express its appreciation to Messrs. Richard Walinski, Cary Rodman Cooper, and Niki Z. Schwartz, counsel for the various parties, whose contribution to the successful conclusion to this lengthy litigation is worthy of special comment.

The Court further orders that the Special Master be dismissed, subject to his reviewing the state of the Defendants' compliance with the Court's final order in this cause and reporting his findings to the Court by December 31, 1978. For the purpose of that review and report, the Special Master shall have all of the authority granted to him by the Court's order filed April 9, 1975. In the event that the Special Master's report discloses substantial noncompliance with the Court's final order in this cause, the Special Master may be reappointed with such powers and duties as the Court may assign at that time.

IT IS SO ORDERED.

APPENDIX

## FIFTH REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' STATE OF COMPLIANCE

Submitted by Vincent M. Nathan *
Special Master

### INTRODUCTION

Since the Court's adoption of the Fourth Report of the Special Master on December 5, 1977, the defendants have remained in substantial compliance with those portions of the Court's order of September 12, 1972, as to which findings of compliance have been made in earlier reports.[1] In addition, compliance plans have been effected in connection with those portions of the Court's original order with respect to which the defendants had not achieved compliance at the time of the Fourth Report. Thus, at the outset of this report the Special Master is able to state that the defendants have achieved substantial compliance with all of the provisions of the Court's order of September 12, 1972, and that, in his opinion, the time has arrived for the Court to terminate ongoing supervision of the defendants' activities in this case.

This happy state of affairs reflects credit upon all of the parties to this litigation and their counsel. Superintendent Perini and Director Denton, as well as members of their respective staffs, have continued ·to manifest the spirit of cooperation which has characterized their behavior since the appointment of the Special Master in December, 1975. Late in April, 1978, when it became apparent that this report would reflect a state of substantial compliance, the Special Master met with counsel for all of the parties to begin discussions on the subject of the termination of the tenure of the Special Master. The results of those discussions are reflected in a proposed Agreement and Order to which reference is made throughout this report and which the Spe-

cial Master recommends be adopted by the Court in substitution for its order of September 12, 1978.

The proposed Agreement and Order incorporates the specific plans of compliance which the defendants have adopted in order to achieve compliance with the Court's order. It provides, in its concluding paragraph, a mechanism for the resolution of all future disputes concerning the defendants' compliance with the Court's mandate in a way which is designed to minimize the Court's further involvement in the affairs of the prison. In addition, the defendants have agreed to maintain on a voluntary basis until January 1, 1979, the interim population limit imposed upon Marion Correctional Institution by the Court in its order of April 9, 1976.[2] Thereafter, if the defendants find it necessary to increase the population at M.C.I., they have agreed to do so in increments of no more than 20 inmates per month. As a result, the Court may feel confident that the practices, procedures, and standards which have been implemented as a result of this lengthy litigation will have a further reasonable period of time in which to become ingrained without the added stress which a precipitous, substantial increase in the prison's population might create.

Finally, the parties have agreed that the monitoring activities of the Special Master should cease for approximately six months after the Court's adoption of this report, but that an on-site review by the Special Master should be conducted at the end of that period. As a result of that review, the Special Master will be in a position to report to the Court, by December 31, 1978, the extent to which the defendants have remained in compliance with the Court's order without the benefit of judicial oversight through the Special Master.

The willingness of Director Denton and Superintendent Perini to agree to all of these matters has convinced the Special

---

* Professor of Law, The University of Toledo.

1. *Taylor v. Perini*, 446 F.Supp. 1184 (N.D.Ohio 1977); *Taylor v. Perini*, 431 F.Supp. 566 (N.D. Ohio 1977); *Taylor v. Perini*, 421 F.Supp. 740 (N.D.Ohio 1976); *Taylor v. Perini*, 413 F.Supp.

189 (N.D.Ohio 1976). The Court's order of September 12, 1972, to which this report relates, may be found at 413 F.Supp. 194 (N.D. Ohio 1976).

2. *Taylor v. Perini*, 413 F.Supp. 189, 194 (N.D. Ohio 1976).

Master that the defendants have no intention of lapsing into a state of noncompliance with the spirit and intent of the Court's order of September 12, 1972. With the assistance of counsel who have displayed the highest form of professionalism in their vigorous representation of their clients' interests in this litigation, the defendants have made it clear that they *wish* to continue to abide by the Court's mandate.

No less remarkable has been the willingness of the two Resident Councils to accept the proposed Agreement and Order, the voluntary temporary limit upon the population level, and the termination of active monitoring by the Special Master as a satisfactory resolution of this litigation. At a meeting of the two Councils on June 20, 1978, a unanimous consensus among the Council members was reached on this matter. That decision reflected well-placed confidence in the judgment of plaintiffs' counsel who has achieved the objectives which his clients sought in filing this action. By focusing upon the substance of the Court's order of September 12, 1972, and avoiding the temptation to convert *Taylor v. Perini* into an instrumentality for the Court's perpetual involvement in the affairs of the prison, the plaintiffs have demonstrated their good faith and their counsel has provided representation and guidance in the best tradition of the legal profession.

The report which follows reflects developments which have occurred at Marion Correctional Institution from January through May, 1978. Reference will be made first to each of the mandatory provisions of the Court's order of September 12, 1972,[3] indicating the extent to which compliance has been maintained or achieved. Then a review of the inmate councils and the grievance procedure, the mechanisms adopted to deal with the requirements of the two prohibitory paragraphs of the Court's order, will be undertaken. In developing the information contained in the report, the Special Master has continued to receive assistance from Mr. Fraser McAlpine, now a recent graduate of The University of Toledo College of Law, and for that assistance he wishes once again to express his gratitude.

## PARAGRAPH 1

Between January 6, 1978 and May 18, 1978, only two pieces of incoming legal mail were opened erroneously outside the presence of the inmate/addressee. This finding is confirmed by logs maintained by institutional mail room personnel and by the absence of any reports by inmates to the Special Master indicating a greater incidence of error. Given the large quantity of mail which is processed every day at the institution, it is clear that Superintendent Perini has been remarkably successful in implementing procedures to avoid error.

With respect to the two errors which were made, Superintendent Perini sent letters of apology to both the senders and the addressees of the letters. This procedure has been incorporated in the proposed Agreement and Order to insure that parties affected in the future by such errors will be informed.

Shortly after the adoption of the Special Master's Fourth Report, the Chief Counsel of the Ohio Attorney General agreed to implement procedures for the mailing of responsive pleadings in inmate initiated litigation against state officials directly to the inmate/addressee. When the Special Master called the attention of the Chief Counsel to the fact that responsive pleadings continued to be sent to the Superintendent with instructions that a copy be delivered to the affected inmate, the Chief Counsel, on February 14, 1978, reiterated his original instructions to the Division of Criminal Activities. Since that time it appears that all such responsive pleadings have been mailed directly to the inmate.

Thus, the defendants have maintained a state of compliance with the provisions of

3. *Taylor v. Perini*, 413 F.Supp. 189, 194 (N.D. Ohio 1976).

Paragraph 1 of the Court's order of September 12, 1972.

## PARAGRAPH 2

In order to maintain compliance with this Paragraph of the Court's original order, the defendants have made a collection of legal materials available in the law libraries in the stockade and in the honor dormitory. In the proposed Agreement and Order, the parties have agreed to a list of materials to be included as a minimum in each of those collections. In an audit of the two libraries conducted by the Special Master's assistant on June 25, 1978, the following required materials were found to be missing:

### Honor Dormitory

Federal Reporter (2d Series), volumes 273–299

Federal Supplement volumes, 180–199

Special Intermediate Supplement for Shepard's United States Citations, Vol. 77, No. 1, parts 1 & 2

Rules of local federal district courts

Palmer, *Constitutional Rights of Prisoners,* 2d ed. 1977

In addition, no hardback copies of volumes 538 and 539 of the Federal Reporter (2d Series) are available in the honor dormitory library. Finally, there is no copy of Page's Ohio Revised Code Annotated, although there is a complete set of Baldwin's Ohio Code.

### Stockade

Federal Reporter (2d Series), volumes 273–299

Federal Supplement, volumes 180–199

Rules of local federal district courts

Cohen, *Legal Research in a Nutshell*

Israel and LaFave, *Criminal Procedure in a Nutshell*

Palmer, *Constitutional Rights of Prisoners,* 2d ed. 1977

A substantial quantity of legal materials not required by the proposed Agreement and Order is available in both libraries.

The photocopy system described in the Special Master's Fourth Report and agreed to by the defendants has been implemented. Records received by the Special Master indicate that inmates are making use of this service through the institution's two law libraries to obtain copies of legal documents at a cost of $.12 per page. The proposed Agreement and Order requires that this service continue to be offered to inmates at a cost not exceeding that charged by commercial photocopy services in Marion, Ohio.

The Special Master finds that the defendants are in substantial compliance with the provisions of Paragraph 2 of the Court's order of September 12, 1972, although steps must be taken at once to complete the law library collections in the institution.

## PARAGRAPH 3

Virtually no difficulties have been encountered by Superintendent Perini in maintaining compliance with this provision of the Court's order requiring provision of paper, pencils, pens, notarial services and postage for use by inmates in preparing and mailing legal documents and correspondence. Early in January it appeared that requisitions for some of these supplies were being reduced by the institution's Business Manager without consulting the Director of the Education Department who is responsible for compliance with this provision. The Special Master brought this matter to the attention of the Superintendent on February 6, 1978, and no further reports of difficulty have been received.

The defendants have continued to maintain a state of compliance with the provisions of Paragraph 3 of the Court's order of September 12, 1972.

## PARAGRAPH 4

Between January 9, 1978 and April 28, 1978, only six publications and two sets of nude photographs were excluded under the screening procedures utilized by the institutional Publications Screening Committee. All of these materials were reasonably within the scope of the criteria for exclusion approved earlier by the Court.[4] The procedural requirements of the screening

4. *Taylor v. Perini,* 421 F.Supp. 740, 775 (N.D. Ohio 1976).

system continue to be adhered to scrupulously.

Two of the publications excluded at the institutional level resulted in appeals to the departmental Publications Screening Committee. Both appeals were denied, and the departmental committee informed the affected inmates of these decisions within 28 working days as required by the procedures approved by the Court.

The proposed Agreement and Order incorporates in detail the standards and procedures mandated by the Court for the screening of incoming publications. In addition, as required by the Court's order of December 5, 1977,[5] the proposed Agreement and Order provides that no reliance will be placed by the institutional Publications Screening Committee on the departmental "Not to be Permitted" list of publications.

The defendants have continued to maintain a state of compliance with the provisions of Paragraph 4 of the Court's order of September 12, 1972.

## PARAGRAPH 5

The Court found the defendants to be in compliance with this provision of its order on September 23, 1976.[6] Once having placed the required books in he prison's library, the defendants, in the opinion of the Special Master, should not be required to replace those books as they are lost or become worn out. This is true particularly in view of the obvious willingness of the defendants to provide library materials of particular interest to black inmates. Thus, no reference to this provision of the Court's order of September 12, 1972, is present in the proposed Agreement and Order.

## PARAGRAPH 6

As the Special Master indicated in his Second Report, compliance with this provi-

sion of the Court's order requires the publication of new inmate manuals for the stockade and for the honor dormitory at M.C.I.[7] The new stockade manual has been prepared and is presently being printed at the Ohio State Reformatory. Distribution to inmates should occur within several weeks. Final copy for the honor dormitory manual has been approved and these manuals will be printed and distributed in the near future. While it will be necessary for Superintendent Perini to maintain these manuals and to update them regularly, they will go far in eliminating the difficulties which led to the inclusion of Paragraph 6 in the Court's original order.

As a test of the effectiveness of these new manuals in providing inmates with fair notice of what conduct is prohibited and the sanctions for violations, the Special Master examined a large number of conduct reports issued between January and March, 1978, for alleged violations of two catchall offenses: Class II—16 ("any act not specifically set forth herein, knowingly done which constitutes an obviously immediate and direct threat to the security of the institution, its staff, other inmates, or the inmate himself") and Class III—15 ("violation of any other published institutional rules, regulations or procedures"). As a result of that examination, the Special Master is satisfied that virtually all prohibited conduct is in fact described in the new inmate manuals. If correctional officers and other staff are trained properly to limit their conduct reports to rules which are described in the manuals or otherwise properly posted in the prison, there is no reason to believe that the defendants will not remain in substantial compliance with the requirements of this provision of the Court's order. In order to make both staff and inmates aware of the requirements of this Paragraph as well as the other portions of the Court's order, the proposed Agreement and Order requires that a verbatim

---

**5.** *Taylor v. Perini,* 446 F.Supp. 1184, 1185 (N.D. Ohio 1977).

**6.** *Taylor v. Perini,* 421 F.Supp. 740, 741 (N.D. Ohio 1976).

**7.** *Taylor v. Perini,* 421 F.Supp. 740, 754 (N.D. Ohio 1976).

copy of the Court's final order be reproduced both in the inmate manuals and in the staff manual mandated by Paragraph 10(a) of the Court's order of September 12, 1972.

The examination which the Special Master has made of the conduct reports referred to above together with the imminent publication of the two inmate manuals are sufficient to support a finding of compliance with Paragraph 6 at this time. In the event that the Court approves a review by the Special Master in December of 1978, the extent of compliance with the requirements of this provision of the Court's order will be the subject of careful scrutiny.

## PARAGRAPH 7

Several relatively minor instances of noncompliance have occurred over the past six months in connection with conditions in the correctional cells in the prison. The 15 and 30 day limitations mandated by Paragraph 7(a) have been adhered to with one exception. An inmate was incarcerated for a period of 20 consecutive days because of two convictions, one of which occurred for conduct committed while the inmate was incarcerated in the correctional cell area. In extending the inmate's correctional cell incarceration beyond the 15 day limit provided in Paragraph 7(a), the defendants were relying upon Administrative Regulation 5120–9–08 which provides in part as follows:

(c) The Rules Infraction Board shall not impose a total of more than fifteen (15) days in disciplinary isolation for any series of offenses arising out of a "spree of offenses".

(1) A rule violation committed while in disciplinary isolation shall be processed within two business days after the commission of the act. Any disciplinary isolation assessed may run concurrently or consecutively with the period assessed for the original offense, up to

fifteen (15) days in the discretion of the Rules Infraction Board. In no event shall an inmate continuously serve more than thirty (30) days in disciplinary isolation.

When the Special Master pointed out that the provisions of this Administrative Regulation were in conflict with those of Paragraph 7(a) of the Court's order, the defendants issued instructions that "there must be a definite break in the assignment of a man to the Correctional Cell after a period of fifteen (15) days."[8]

Superintendent Perini has continued to experience difficulty in complying with the requirements of Paragraph 7(a) in cases involving inmates who are being transferred to a maximum security institution as a result of their conduct. In such cases, delay in effecting the physical transfer of the prisoner from M.C.I. results in the need to keep him in isolated confinement for a period of time which may exceed one or both of the limitations in Paragraph 7(a). In an effort to avoid noncompliance, the Superintendent has transferred such persons to cells or wards in the medical area of the institution. The result of this practice has been the overcrowding of the medical area on occasion and a dysfunctional allocation of medical facilities. For this reason, the parties have agreed to a modification of this provision of the Court's order which would permit the 15 and 30 day limitations to be exceeded in cases involving inmates whose transfer to another correctional institution has already been approved by the Department of Rehabilitation and Correction. In the opinion of the Special Master, the proposed modification is an appropriate response to a legitimate need of the Superintendent, as it is not feasible to return an individual to the general population after he has been informed of his imminent transfer to a maximum security institution.

A second difficulty was encountered in connection with Paragraph 7(b) of the Court's order requiring that normal institutional meals excepting desserts be served in

---

**8.** Letter from W. J. Whealon, Deputy Institution Superintendent, to the Special Master, April 20, 1978.

the correctional cells. For an undetermined period of time, milk was not served to inmates in the correctional cell area although milk was available in the main cafeteria. When this matter was brought to the attention of institutional officials, an order was issued on March 28, 1978, to the effect that milk was to be served in the correctional cells whenever it was available in the main cafeteria. Since that time the Special Master has received no complaints on this subject.

Another issue relating to food service in the correctional cells concerned the serving of fresh fruit. Although fresh fruit is available from time to time in the main cafeteria, it is not served to inmates in correctional cells. According to the institution's administration, certain fresh fruits such as oranges and bananas are particularly susceptible to the secreting of contraband. The defendants proposed to substitute canned fruit for fresh fruit in the correctional cells and the Special Master agreed. On April 13, 1978, the Superintendent issued an order to the effect that appropriate substitutions were to be made whenever fresh fruit appeared on the menu in the main cafeteria as a part of the main meal.

Finally, from February 19 until May 7, the number of medical rounds made in the correctional cell area was reduced from three to two. This resulted from a shortage of staff in the infirmary which necessitated the adoption of two 12 hour employment shifts rather than three 8 hour shifts. As a result, the defendants believed that Paragraph 7(d) required only two rounds per day. When this matter was raised with the defendants, they agreed to continue the practice of making three medical rounds per day in the correctional cell area regardless of the number and length of the employment shifts worked by employees in the infirmary. During the course of discussions concerning the terms of the proposed Agreement and Order, departmental representatives suggested that rounds made during the third shift (between midnight and 8:00 a. m.) were unlikely to be useful and suggested that rounds be confined to the first two shifts of the day.

The Special Master agreed to this suggestion in view of two related improvements which the defendants agreed to implement. First, the current practice of permitting a correctional officer to dispense prescription medication to inmates incarcerated in correctional cells does not represent "normal medical care" in the institution since all prescription medication is dispensed in the infirmary itself by medical personnel. The defendants agreed to extend this practice to the correctional cells. Second, numerous reports to the Special Master indicated that the officer formerly assigned to the correctional cell area made a practice of spending substantial periods of time out of that area and thus out of communication with the inmates. This practice constituted a health threat to inmates in the correctional cells as they were unable to summon anyone for assistance in the event of an emergency. The defendants agreed to maintain a correctional officer in the correctional cell area on a continuous basis. These agreements are reflected in the proposed Agreement and Order.

No other violations of any of the provisions of Paragraph 7 of the Court's order of September 12, 1972, have come to the attention of the Special Master. In view of the fact that it appears that the defendants have attempted to maintain a state of full compliance, that instances of noncompliance have been isolated and, in most cases, the result of an honest misinterpretation of the requirements of the Court's mandate, and that the defendants have moved quickly to correct inappropriate practices when they were brought to their attention, the Special Master finds that the defendants have continued to maintain substantial compliance with the requirements of this provision of the Court's order.

## PARAGRAPH 8

The job assignment system described in the Special Master's Fourth Report[9] was put into effect at M.C.I. early in November, 1977. The system, designed in large part by Professor Timothy Heinsz of The University of Toledo College of Law, has met with outstanding success. The following chart indicates the number of job transfers effected on a monthly basis since the inception of the new system:

| Month | Inter-shop Transfers | Intra-shop transfers | Total Transfers |
|---|---|---|---|
| November, 1977 | 24 | 34 | 58 |
| December, 1977 | 40 | 37 | 77 |
| January, 1978 | 52 | 17 | 69 |
| February, 1978 | 20 | 47 | 67 |
| March, 1978 | 72 | 41 | 113 |
| April, 1978 | 50 | 51 | 101 |
| May, 1978 (through May 19) | 39 | 49 | 88 |
| TOTAL | 297 | 276 | 573 |

Of these numbers, 198 inter-shop and 245 intra-shop transfers occurred in the stockade for a total of 443; 99 inter-shop and 31 intra-shop transfers occurred in the honor dormitory for a total of 130. In virtually all cases inmate bidding has been active, and both black and white inmates have submitted bids. In the honor dormitory there was only one instance in which an inmate not within the top five in seniority among the bidders was chosen for the job, and that job was a skilled position requiring a licensed motor vehicle driver. In the stockade, only two job assignments were made to inmates not within the top five in seniority among all bidders. One of these decisions was based upon the qualifications needed for the job and the second was based upon the need to bring about racial balance in the affected shop. Thus, it is clear that the defendants are complying both with the letter and the spirit of the new job assignment system.

It is gratifying to note that the new system has met with acceptance on the part of staff and inmates alike. In an audit conducted on March 6, 1978, by members of the staff of the Department of Rehabilitation and Corrections, the following conclusion was reported to Director Denton:

. . . there has been a favorable response to the program from inmates and staff alike. There is good response to every job posting.

The Special Master wishes to single out for special commendation Mr. Gary Mohr, the Job Counselor appointed to implement and direct the new job assignment system. There is no question but that the success of the system, as well as its acceptance throughout the institution, reflect the diligence and dedication which he has brought to his task. In addition, the records which he prepared and submitted to the Special Master constitute a model of clarity and accuracy.

The effect of the new job assignment system has been to reduce substantially the number of shops and job categories reflecting unacceptable racial imbalance. Under the new system all shops and job categories employing four or more inmates must reflect the racial balance of the institution within a deviation of ± 20%. On May 19, 1978, the racial balance in the stockade was

9. *Taylor v. Perini*, 446 F.Supp. 1184, 1208–1210 (N.D.Ohio 1977).

 57.5% black and 42.5% white. Thus, the permissible percentage of black inmates who could be employed in a shop or job category employing four or more inmates was 37.5 to 77.5; the permissible range of white inmates who could be employed was 22.5% to 62.5%.

As of May 19, 1978, all shops in the stockade were in compliance with this standard except for the "maintenance crew" shop which employed three blacks (28%) and eight whites (72%). Of 138 job categories in the stockade (excluding clerks, porters, and students), only 10 failed to reflect racial balance within the permitted deviation.

| Shop & Job Category | # Black | % Black | # White | % White |
|---|---|---|---|---|
| Cafeteria – pot & grill | 1 | 17 | 5 | 83 |
| Cafeteria Officers | 4 | 80 | 1 | 20 |
| Infirmary – treatment room aids | 2 | 22 | 7 | 78 |
| Laundry – night pants | 4 | 100 | 0 | 0 |
| Library – law clerks | 1 | 25 | 3 | 75 |
| Maintenance – roofing crew | 2 | 33 | 4 | 67 |
| Recreation – equipment room | 4 | 100 | 0 | 0 |
| Sheet metal – break press | 1 | 25 | 3 | 75 |
| Sheet metal annex – welder | 1 | 20 | 4 | 80 |
| Sheet metal annex – chair assembler | 2 | 33 | 4 | 67 |

Clerk and porter assignments in the stockade were within the racial balance deviation permitted by the new job assignment policy. Fifty-seven clerks (47.9%) were black and 62 (52.1%) were white. Likewise, 94 porters (57%) were black and 71 (43%) were white.

On May 19, 1978, the racial balance in the honor dormitory was 54.6% black and 45.4% white. Thus, the permissible percentage of black inmates who could be employed in a shop or job category employing four or more inmates was 34.6 to 74.6; the permissible range of white inmates who could be employed was 25.4% to 65.4%. All shops in the honor dormitory were in compliance with this standard with two exceptions.

| Shop & Job Category | # Black | % Black | # White | % White |
|---|---|---|---|---|
| Frank's Farm Gang | 4 | 27 | 11 | 73 |
| Validation Plant | 25 | 78 | 7 | 22 |

Of 62 job categories excluding porters and clerks, only four were in noncompliance.

| Shop & Job Category | # Black | % Black | # White | % White |
|---|---|---|---|---|
| Dairy Barn – feeder | 1 | 25 | 3 | 75 |
| Frank's Farm Gang – laborer | 4 | 29 | 10 | 71 |
| Validation Plant – bagger | 10 | 83 | 2 | 17 |
| Validation Plant – inspectors | 7 | 78 | 2 | 22 |

Clerks in the honor dormitory were divided exactly equally between the races. Of the 15 porters assigned in that unit, 11 (73.3%) were black and four (26.7%) were white.

These data have satisfied the Special Master that a fair degree of racial balance has been achieved in the assignment of jobs throughout M.C.I. Given the large number of shops and job categories, imbalance in a

few shops and job categories at any given time is to be expected in the absence of a rigid quota system. Since the implementation of the new job assignment procedures, however, the shops reflecting impermissible racial imbalance have changed from time to time. The Special Master concurs with both staff and inmates who have indicated that the adoption of a strict quota as the determining factor in job assignments would be undesirable. Given the obvious good faith effort which the Job Counselor and the job assignment committees within the institution have made to avoid racial discrimination, the Special Master believes that they are to be commended for the record of integrated inmate employment demonstrated by this report.

Under the new job assignment procedures, it is clear that job supervisors do not possess unfettered discretion to remove an inmate from his job. Between November and the middle of May, 1978, 94 requests were made by job supervisors or the Rules Infraction Board for job removals. Of these the appropriate job assignment committee approved only 58 or 61.8%. Thirty-six or 38.2% of such requests were denied. It appears that the job assignment committees are making a *bona fide* inquiry into the question of whether the conduct leading to the job removal request was in fact job related. A review of the records maintained by the stockade Reclassification Committee and the honor dormitory Reclassification Committee has convinced the Special Master that these committees have approved disciplinary job removals in a manner which is consistent with the requirements of Paragraph 8(c) of the Court's order of September 12, 1972.

After the first six months of operation under the new job assignment procedures, the Special Master met with the Job Counselor to discuss modifications which that experience indicated should be made in the procedures. As a result a number of changes were agreed to. The most important of these include the elimination of the prerogative of the job supervisor to select for an intra-shop transfer an inmate who is not among the top five in seniority bidding for the job. During the six and one-half months of operation under the new system no job supervisor availed himself of this privilege, and the Job Counselor and the Special Master agreed that the review procedures designed for such exceptional cases were too complex to warrant their continued inclusion in an already complicated system. A second important change which will be welcomed by inmates permits an inmate to bid on a job under inter-shop transfer procedures in spite of the fact that the inmate has been on his present job for less than 90 days. While preference may be given to an inmate who has been on his job for 90 days or more, the absolute disqualification from bidding has been eliminated. Finally, the procedures for assignment of inmates to jobs involving special security consideration have been simplified. All such positions will be filled through regular inter-shop transfer procedures, subject to the final approval of the Superintendent. Other minor modifications were made to clarify or simplify the job assignment procedures. All procedures for the assignment of initial jobs and for effecting intra-shop and inter-shop transfers have been incorporated in the proposed Agreement and Order.

One change in the job description of the Job Counselor was consented to by the Special Master with some reluctance. The current job description prohibits the Job Counselor from employing an inmate clerk in his office. The purpose of this provision was to avoid any possibility of inappropriate inmate influence over the assignment of jobs. The Job Counselor persuaded the Special Master, however, that he requires substantial clerical assistance in order to accomplish the many and varied responsibilities which constitute his job. At the present time it appears that sufficient civilian clerical assistance simply is not available. With the Job Counselor's assurance that any inmate clerk employed by him will be uninvolved in any aspect of the job assignment

process which could affect the actual bidding or assignment processes, the Special Master agreed to a modification of the Job Counselor's job description to permit the employment of an inmate clerk.

On the basis of the evidence which has been compiled over the period of more than six months during which the new job assignment procedures have been in effect, the Special Master finds that the defendants are in compliance with the provisions of Paragraph 8 of the Court's order of September 12, 1972.

## PARAGRAPH 9

In his Fourth Report, the Special Master recommended that job assignments to the shops dealt with in this Paragraph be made in accordance with the procedures developed for accomplishing compliance with Paragraph 8 of the Court's order.[10] Thus, the 20% deviation factor with respect to racial balance is applicable to all Paragraph 9 shops and job categories by virtue of the new job assignment system, and the defendants are in compliance with the provisions of that Paragraph of the Court's order of September 12, 1972.

## PARAGRAPH 10

With the publication and distribution of a staff manual containing written rules prohibiting racial discrimination, harassment, intimidation and insult, the defendants achieved full compliance with the provisions of Paragraph 10(a) of the Court's order of September 12, 1972. Under the proposed Agreement and Order it will be necessary to include a copy of the Court's final order in that manual. The effect of that inclusion will be to assure that members of the staff become and remain aware of the continuing effect of the Court's mandate.

The proposed Agreement and Order incorporates the language which is being included on all staff job descriptions and employment application forms utilized at

M.C.I. Thus, the substance of Paragraph 10(b) of the Court's order of September 12, 1972, with which the defendants have been in compliance for many months, will be carried over into the Court's final order in this case.

The defendants have remained in compliance with the provisions of Paragraph 10(c) of the Court's original order requiring an orientation program for incoming staff. That provision is contained in the proposed Agreement and Order.

As of May 9, 1978, the Marion Correctional Officer Psychological Inventory, developed in order to achieve compliance with Paragraph 10(d) of the Court's original order, had been administered four times. A total of 103 persons were tested on these occasions and received passing or failing scores. (Several scores were invalid or otherwise uninterpretable.) Of these 103, 90 passed and 13 failed the test. Thus, 12.6% of this group were disqualified by the examination, which has become the state civil service test for correctional officer applicants at M.C.I.

In a letter of March 16, 1978, addressed to the Special Master by Mr. Norman Peterson, the director of the MCOPI project, the latter stated,

As I indicated in the final report, I expected an 8% fail rate *if* the Marion applicant population were a random sample from the "normal" population. Our earlier testing indicated that the applicants at Marion were scoring somewhat differently from the average "normal" population so I did expect a higher fail rate than 8%. (emphasis in original).

Thus, it appears that the administration of the MCOPI is having the desired effect of disqualifying a significant number of applicants whose personality characteristics would make them unacceptable correctional officers.

The Department of Administrative Services has been most cooperative in administering the MCOPI on a monthly basis to meet the employment needs of the institu-

10. *Taylor v. Perini*, 446 F.Supp. 1184, 1211 (N.D.Ohio 1977).

tion. Frequent administration is required because the nature of the battery precludes the provisional hiring of applicants subject to their subsequent successful completion of the test. In spite of these efforts, however, M.C.I. has experienced substantial under-staffing since the adoption of the MCOPI. According to the institution's Personnel Officer, M.C.I. was understaffed by 14 officers in January, by 17 officers in February, by 9 officers in March, and by 17 officers as of May 9, 1978.

In order to attempt to find a solution to this problem, the Special Master met with staff from the Department of Administrative Services on May 12, 1978. At that time all parties agreed that the best solution would be to permit officials at M.C.I. (the Personnel Officer or the Director of Psychological Services) to administer the test on an "as needed" basis. The Department of Administrative Services, in turn, would provide certification lists as quickly as possible after the receipt of the test answers from M.C.I. The effect of this procedure would be to shorten the time between the applicant's initial interview and the institution's decision to hire or not to hire.

In order to ascertain the legality of permitting a person not employed by the Department of Administrative Services to administer the MCOPI, that Department sought and obtained an opinion from the Attorney General of Ohio. That opinion, reversing prior precedent to the contrary, was issued on June 27, 1978, and approved the procedures proposed by the Special Master. Thus, it appears that the difficulties which have been encountered in obtaining civil service certification lists with sufficient frequency to maintain a full complement of correctional officers will be ameliorated in the future.

Discussions between the Special Master and Mr. Norman Peterson of Personnel Decisions Research Institute indicate that satisfactory progress is being made in connection with the longitudinal empirical validation study of the MCOPI at Ohio's other adult correctional institutions. Funding for the second year of the study was obtained by the Department of Rehabilitation and Correction through the Law Enforcement Assistance Administration, and P.D.R.I.'s final report to the Department is due in the autumn of 1979. When the test has been validated at all of Ohio's adult correctional institutions, it will replace the current civil service test and will be administered to all applicants for correctional officer positions in adult correctional institutions in the State of Ohio.

Until the MCOPI comes to be used throughout the state, M.C.I. will continue to receive occasional applications for employment from persons currently employed as correctional officers in other Ohio prisons. These persons, having passed the civil service test which is administered to applicants for positions at prisons other than M.C.I., might raise serious objection to being required to pass the MCOPI. In order to avoid needless confrontation between the Court's order and the state's civil service laws, and because of the extremely limited number of such requests for transfer, the parties have agreed to the inclusion in the proposed Agreement and Order of language which would permit such transfers on a limited basis without requiring the administration of the MCOPI. In time this problem will resolve itself.

As a result of the ongoing administration of the MCOPI, the defendants are in compliance with Paragraph 10(d) of the Court's order of September 12, 1972. This could not have occurred in the absence of the continuing cooperation of the Department of Rehabilitation and Correction, the Department of Administrative Services, the Attorney General of Ohio, and the Law Enforcement Assistance Administration; the Special Master wishes to express his appreciation to all of these agencies for their assistance.

Following the Court's adoption of the Special Master's Fourth Report, Director Denton and Superintendent Perini agreed to implement a program of in-service training for all employees at M.C.I. who have

significant direct contact with inmates at the institution. The program consists of 16 hours of re-training administered to all employees after their first year of employment. Employees who attend a course of in-service training held at the Ohio Peace Officer Training Academy in a given year are exempt from further re-training during that year.

The re-training program being offered at M.C.I. includes the following course topics:

| Topic | Hours of Instruction |
|---|---|
| First Aid | 2 |
| Equal Employment Opportunity | 1 |
| Safety, Accident Prevention & Sanitation Procedures | 1 |
| Communications | 1 |
| Practical Psychology | 1 |
| Taylor v. Perini consent order (racial harassment, intimidation or insult) | 1 |
| Coping with job related stress | 1 |
| Department of Rehabilitation & Correction Administrative Regulations, Institutional Policies | 2 |
| Human Relations - Working with Inmates | 2 |
| Handling Critical Incidents | 1 |
| Inmate Discipline Process | 1 |
| Introduction/Summary/Evaluations | 2 |

Various staff members from a number of departments within the institution are providing instruction in the in-service training program which is being directed by Mr. William Kempton, the institution's Training Officer.

Between January 1 and May 30, 1978, 143 employees participated in the in-service training program described above. Of these, 88 were non-security personnel and 55 were employees engaged in security related jobs. During this same period, 34 new employees participated in the new employee orientation program required by Paragraph 10(c) of the Court's order. Finally, 29 employees received re-training at the Ohio Peace Officer Training Academy. Thus, a total of 206 employees received training incorporating the objectives of Paragraphs 10(c) and 10(e) during this period. Thirteen employees have been exempted from re-training on the basis that their jobs do not put them in contact with inmates (e.g. tower guards). Another six have been exempted because of their imminent retirement from employment. As of May 19, 1978, the total number of persons employed at M.C.I. was 310, of whom 152 were security personnel and 158 were non-security personnel. Thus, putting aside the matter of employee turnover during this period, approximately 71% of those persons eligible for training received some form of pre-service or in-service training during the five and one-half months commencing January 1, 1978. Ninety-one employees are scheduled for 16 hours of in-service training from September 20, 1978 through December 1, 1978, and four additional employees are scheduled for re-training at the Ohio Peace Officer Training Academy during that period.

With the adoption and implementation of the in-service training program described above, the defendants have achieved compliance with the provisions of Paragraph 10(e) of the Court's order of September 12, 1972.

Full compliance with the requirements of Paragraph 10(f) of the Court's order was achieved when the defendants allocated a period of one and one-half hours during the incoming inmate orientation program to a discussion of the institution's commitment

to racial equality. During the course of this presentation, a member of the staff attempts to convey the substance of the Court's order in *Taylor v. Perini* and to relate that order to the programs and policies of the institution.

As indicated in the Fourth Report of the Special Master, Paragraph 10(g) of the Court's order of September 12, 1972, was superseded by the appointment of the Special Master.[11] In order to fulfill the spirit of this provision, however, the parties have agreed to the inclusion of a provision in the proposed Agreement and Order calling for an annual audit by the departmental Chief Inspector of the extent of compliance with the Court's final order. This report will be submitted to the Director of the Department of Rehabilitation and Correction and will be maintained in the files of the Chief Inspector.

In summary, the defendants have achieved a state of compliance with all of the provisions of Paragraph 10 of the Court's order of September 12, 1972.

## PARAGRAPH 11

The defendants have not maintained full compliance with the provisions of this Paragraph of the Court's original order which has been construed to require the assignment of inmates to the various housing units of the institution to reflect the racial balance of the overall population of the stockade and the honor dormitory respectively, allowing for a deviation factor of ± 5%. The average figures obtained for the weeks ending April 21, April 28, May 5, and May 12, 1978, indicate that the overall racial breakdown of the stockade population was 43.9 white and 56.1 black. The following figures indicate the average racial breakdown in each cellblock and dormitory in the stockade for that four weeks period.

| Housing Unit | # White | # Black | % White | % Black | % Deviation from Total Population |
|---|---|---|---|---|---|
| 1 Cellblock | 26.25 | 39.25 | 40.80 | 59.92 | 3.82 |
| 2 Cellblock | 28.00 | 38.00 | 42.42 | 57.58 | 1.48 |
| 3 Cellblock | 30.00 | 36.75 | 44.94 | 55.06 | 1.04 |
| 4 Cellblock | 25.75 | 40.50 | 38.87 | 61.13 | 5.03 |
| 5 Cellblock | 32.25 | 33.75 | 48.86 | 51.14 | 4.96 |
| 6 Cellblock | 34.25 | 30.75 | 52.69 | 47.31 | 8.79 |
| 1 Dormitory | 32.25 | 30.25 | 51.60 | 48.40 | 7.70 |
| 1A Dormitory | 25.25 | 37.50 | 40.24 | 59.76 | 3.66 |
| 2 Dormitory | 18.75 | 43.50 | 30.12 | 69.88 | 13.78 |
| 2B Dormitory* | – | – | – | – | – |
| 3 Dormitory | 27.50 | 32.75 | 45.64 | 54.36 | 1.74 |
| 3C Dormitory | 13.50 | 46.25 | 22.59 | 77.41 | 21.31 |
| 4 Dormitory | 23.50 | 39.25 | 37.45 | 62.55 | 6.45 |
| 4D Dormitory | 23.25 | 39.25 | 37.20 | 62.80 | 6.70 |
| 5 Dormitory* | – | – | – | – | – |
| 5E Dormitory* | – | – | – | – | – |
| 6 Dormitory | 32.00 | 31.75 | 50.20 | 49.80 | 6.30 |

\* These dormitories are exempt from racial composition guidelines because they are used for assignment of inmates participating in educational or drug rehabilitation programs. See <u>Taylor v. Perini</u>, 446 F.Supp. 1184, 1215 (N.D. Ohio 1977).

Thus, during the period measured, the defendants were in a state of noncompliance in two cellblocks and six dormitories.

During the weeks for which the preceding data were developed, the racial breakdown in the honor dormitory averaged

11. *Taylor v. Perini*, 446 F.Supp. 1184, 1214 (N.D.Ohio 1977).

43.76% white and 56.24% black. Bed assignments in each of the two honor dormitory bays reflected these percentages within a ± 5% deviation factor.

Although the Special Master indicated in his Fourth Report that the Court "must accept the possibility that full and literal compliance may never be achieved in several dormitories within the stockade," [12] he is nonetheless disappointed at the slippage which has occurred with respect to stockade dormitories since October of 1977 as well as the failure to maintain compliance in cellblocks over which the defendants exercise considerably greater control with respect to assignments.

In the course of discussions with counsel concerning the content of the proposed Agreement and Order, the parties agreed to increase the permissible deviation factor with respect to dormitories to ± 15% but to retain the ± 5% deviation factor in the case of cellblocks. If these standards were to be applied to the data reported above, the defendants would be out of compliance in two cellblocks (although the extent of noncompliance in the case of 4 Cellblock is *de minimis*) and in only one dormitory. Because of the constant receipt and release of inmates at the institution, noncompliance with respect to a single dormitory at any given time is understandable, and the parties have agreed to include a provision in the proposed Agreement and Order permitting greater than 15% deviation in any single dormitory. Thus, under the standards adopted in the proposed Agreement and Order, the defendants would be substantially out of compliance in only one cellblock at the present time.

An examination of bed patterns in the stockade dormitories and in the honor dormitory bays indicates that the defendants have accomplished a reasonable degree of racial integration in the various bed rows. Although some undesirable concentrations continue to exist, the institution's policy of forbidding voluntary bed transfers which would increase segregation in a bed row is having its intended effect. During the course of the next six months the defendants must continue to concentrate upon this problem, as well as that of racial concentration in the cell rows in a number of cellblocks.

In view of the standards agreed to by the parties in the proposed Agreement and Order and because of the difficulties involved in achieving full compliance with Paragraph 11 which the Special Master has outlined in previous reports, it is the finding of the Special Master that the defendants are in substantial compliance with the provisions of this Paragraph of the Court's order of September 12, 1972. In the event of a review by the Special Master in December of 1978, however, the defendants should be aware of the fact that they are expected to adhere literally to the provisions of the Court's final order on this subject.

### PARAGRAPH 12

Paragraph 12 of the Court's original order required the deletion of any reference to this litigation from the files of 67 named inmates. Compliance with this provision was reported in the Second Report of the Special Master.[13] In order to address the substance of the problem which brought about the inclusion of Paragraph 12 in the Court's original order, however, the parties have agreed to the inclusion of a provision in the proposed Agreement and Order which prohibits the placing of any reference or document relating to the filing of a grievance or to a claim of violation of the Court's final order in any inmate's file which is available to the Adult Parole Authority.

### THE RESIDENT COUNCILS

Both resident councils within the institution have been active since the Court's adoption of the Special Master's Fourth Report. While both councils have achieved significant success on a number of projects,

12. *Taylor v. Perini*, 446 F.Supp. 1184, 1216 (N.D.Ohio 1977).

13. *Taylor v. Perini*, 421 F.Supp. 740, 774 (N.D. Ohio 1976).

these organizations continue to experience frustrations which, in the opinion of the Special Master, could be alleviated by a more constructive attitude on the part of staff and administration. Several of the standing committees of the stockade council have experienced difficulty in meeting regularly with assigned staff liaison. In addition, neither council nor the committees of the stockade council have met with the Superintendent on a regular or frequent basis. Inordinate delays continue to be experienced in effectuating some of the decisions which have emerged from council/administration discussions.

Reports have reached the Special Master that several job supervisors have informed council members that their council-related activities were consuming too much time to permit the inmates' continuation on their job assignments. In several cases, job supervisor pressure has been cited as the reason for members' resignation from the council. While evidence on a matter of this kind is difficult to establish, the development—if true—is an alarming one.

In spite of repeated requests by the stockade council and by the Special Master, the Superintendent has been unwilling to share information with the council concerning the status of the Industrial and Entertainment Fund, a source of funds for the general welfare of the inmate population. While the Special Master has not suggested that the council should have any formal authority over decisions regarding the expenditure of these funds, he agrees with the council that more intelligent priorities could be set by the inmate groups if they had access to this information. Furthermore, the councils would constitute a legitimate source of inmate input into administrative decisions concerning the disbursement of these monies. The position of the Superintendent in this matter has been a genuine irritant to the members of the stockade council and is being taken by them as an indication of the limited interest of the administration in working with the organization.

On the positive side, the stockade council published recently a list of its accomplishments since February of 1978. These include the following:

1. A decision to keep cold pills in all housing units;
2. The hiring of a second part-time dentist;
3. The institution of an emergency telephone call system;
4. The availability of irons and ironing boards in the housing units;
5. Installation of equipment for improved television reception;
6. Progress on the installation of telephones for a program of non-emergency telephone calls on a monthly basis;
7. Adoption of a policy permitting the last housing unit to be served (on a rotating basis) in the cafeteria to receive extra food which otherwise would be thrown away;
8. Admission of protein and vitamin pills in addition to regular food packages;
9. Installation of a shield at the visiting desk to preserve the confidentiality of an inmate's visiting list;
10. Increase in the number of black grooming products handled in the Commissary;
11. A new open gym policy;
12. A policy permitting parolees to wear their own clothing when they leave the institution;
13. Repairs to furnishings in the visiting room;
14. Issuance of diplomas to certain inmate/employees in the food service department.

The honor dormitory council has been successful in having doors installed on the booths of the visiting women's restroom and in obtaining a liberalization of the institutional policy on the receipt by inmates of shampoo and deodorant. In addition, a second mail pick-up in the honor dormitory was approved as a result of the council's recommendations. Many other proposals, however, have met with no success or with

temporizing on the part of the administration. One interesting example relates to a request for the assignment of a paramedic to the honor dormitory to take the place of the inmate "nurse" who presently dispenses medication and schedules men for sick call. The best response which the council has been able to obtain is that two new paramedics are in the process of being trained and that when they are, "it is probable that some time can be spent on station at the Honor Dormitory as Mr. Perini indicated." One wonders if the administration is aware of the recent recommendation of the outside grievance review committee that paramedics "be more available for the Honor Dorm as they are in the other institution."

The Special Master is fully aware that judicial fiat cannot achieve the cooperation and assistance which are necessary in order to make the two resident councils fully effective mechanisms for bringing to light the kind of problems which led to this litigation. While the defendants have committed themselves in the proposed Agreement and Order to maintain both councils in perpetuity, there is little that the Court can do to bring about the spirit of genuine acceptance which is essential if these organizations are to survive. It may be that a period of time for interaction between the councils and the administration, without oversight by the Special Master, will produce progress in this direction.

Elections for the new councils will be held during the first week of August, 1978. The Special Master strongly suggests that Superintendent Perini and his senior staff meet with both councils before that time to encourage active inmate participation in both elections. With the election of the fifth councils and without further prodding by the Special Master, the defendants will have a fresh opportunity to work in a constructive manner with these groups. Perhaps the Superintendent will be encouraged to do so by his recollection of the highly responsible manner in which the stockade council responded to him during the work stoppage in October of 1978. The proposed Agreement and Order provides only a skeletal structure for the maintenance of the two councils; the substance must be provided by the administration, staff, and inmates working together to implement a joint venture, the success of which will redound to the benefit of the inmates and the institution alike.

### THE GRIEVANCE PROCEDURE

Inmates at M.C.I. have continued to make extensive use of the grievance procedure since the Court's adoption of the Special Master's Fourth Report. The following table indicates the number of grievances filed at Marion Correctional Institution, the number of grievances filed in all eight of Ohio's adult correctional institutions, and the percentage of that total represented by M.C.I. grievances.

| Month | Number of MCI Grievances | Number of Grievances Filed in All Prisons | % of Total Filed at MCI |
|---|---|---|---|
| January | 73 | 162 | 45 |
| February | 76 | 138 | 57 |
| March | 70 | 171 | 41 |
| April | 61 | 179 | 34 |
| May | 74 | 189 | 39 |
| TOTAL | 354 | 839 | 42 |

These figures indicate to the Special Master that inmates continue to have sufficient confidence in the system to utilize it. That confidence, in the opinion of the Special Master, has been enhanced by the implementation of outside review by the members of the Citizens Advisory Committee at M.C.I. This experimental program, which

commenced on February 15, 1978, has been successful, both in the opinion of inmates and in that of the Inspector of Institutional Services.

Prior to the implementation of outside review all ten members of the Citizens Advisory Committee attended an intensive three-day training session conducted by personnel from the Center for Community Justice on January 6 through 8, 1978. The fact that the committee members were willing to devote some 30 hours of their time to training over the course of a weekend augured well for the success of the program. The Special Master attended all of these sessions and agreed with the members of the Citizens Advisory Committee that the training program was outstanding in every respect.

In order to obtain the benefit of an independent review of the operation of the grievance system since the implementation of the outside review stage, the Special Master again sought the assistance of the Center for Community Justice. With funds provided by the National Institute of Corrections, two staff members of the Center conducted a two day on-site audit of the grievance procedure at M.C.I. Their final report is attached hereto as Appendix A, p. 1274 *infra*. The Special Master concurs with the observations, findings, and recommendations contained in that report and recommends them to Director Denton, Superintendent Perini, the Chief Inspector, M.C.I.'s Inspector of Institutional Services, and the members of the Citizens Advisory Committee. The adoption of the Center's recommendations, in the opinion of the Special Master, will strengthen the grievance system in general and enhance the usefulness of the process of outside review in particular.

In view of the exhaustive nature of the report submitted by the Center for Community Justice, the Special Master will add only a few comments reflecting his observations of the grievance system over the past six months. Unfortunately, there has been little continuity in the office of the departmental Chief Inspector during this period. The first Chief Inspector, David McKeen, was appointed to serve as Managing Officer of the Columbus Correctional Facility in January, 1978, shortly before the implementation of outside review at M.C.I. His successor, Jon Kelly, served as Acting Chief Inspector from that time until late May when the position was filled on a permanent basis. The new Chief Inspector is William Thoroman, who served as Inspector of Institutional Services at Lebanon Correctional Institution since December, 1977, when the present inmate grievance procedure was implemented by the Department of Rehabilitation and Correction. Prior to that time, Mr. Thoroman served as Inmate Liaison Officer at Lebanon. Mr. Thoroman's appointment is consistent with the recommendation of the Special Committee to Monitor the Inmate Grievance System that the Chief Inspector should be a person with at least one year's experience as an Inspector of Institutional Services.[14] The Special Master had occasion to meet Mr. Thoroman during the course of the latter's tenure at Lebanon Correctional Institution and has met with him since his promotion to the Chief Inspectorate. In the opinion of the Special Master, the Department has made an excellent choice and has selected a person who will provide the degree of guidance and organization which is needed in order to realize fully the potential of the grievance system.

One matter to which the Special Master suggests that Mr. Thoroman devote his immediate attention relates to the implementation of decisions rendered by the Chief Inspector on appeal. In addition to keeping members of the Citizens Advisory Committee informed of actions taken in cases involving outside review as recommended by the Center for Community Justice, the Chief Inspector must take steps to see that his final decisions are in fact implemented at the institutional level. One example will suffice.

---

**14.** *Taylor v. Perini*, 446 F.Supp. 1184, 1221 (N.D.Ohio 1977).

On September 30, 1977, the Chief Inspector reversed a decision of the Inspector of Institutional Services at M.C.I. in a case involving the confiscation of an incoming package which contained contraband. When the contraband was discovered in the course of a routine inspection, the entire contents of the package were confiscated. The Chief Inspector ruled that "the proper procedure was to deliver the contents of the package to you, except that the cash (contraband) would be returned to the sender at your expense." Whether or not the inmate/grievant ever received the contents of the package, the Special Master does not know. Late in June, 1978, however, the Special Master, in discussions concerning the contents of the soon to be published honor dormitory Inmate Manual, learned that institutional officials were still under the impression that the entire contents of a package containing an item of contraband would be returned to the sender at the inmate's expense.

In addition to developing a system for the implementation of decisions made by the Chief Inspector and the Inspector of Institutional Services, it is important for the Chief Inspector to meet with M.C.I.'s institutional Inspector on a regular and frequent basis in order to resolve any problems in the operation of the system. This is not to suggest that the Inspector at Marion is unable to do his job; rather it simply recognizes the strains which are being placed upon M.C.I.'s Inspector who is dealing with more than 40% of all the grievances filed in Ohio's prisons.

Without interfering with the independent role of the Citizens Advisory Committee, the Chief Inspector should meet with that group and encourage them in every way to continue the outstanding work which they have accomplished over the past four months. To the extent that he is able to do so, the Chief Inspector should be certain that the Citizens Advisory Committee is receiving necessary clerical assistance and other forms of support which are necessary in order for this volunteer group to function with a minimum of inconvenience to its members.

Finally, it is necessary for the Chief Inspector to establish communication with the two Resident Councils at M.C.I. In view of the changing constituency of these councils, each group will require orientation to the grievance procedure and the Chief Inspector should provide a part of that instruction. Moreover, by establishing and maintaining communication with the Resident Councils the Chief Inspector will become aware of institutional problems perceived by these groups including alleged deficiencies in the grievance procedures.

The chief concern of the inmates, of course, relates to the quality of the decisions reached through the grievance procedure, and this subject defies easy generalization. The Special Master is convinced that all participants—the Inspector of Institutional Services, the members of the Citizens Advisory Committee, and the Chief Inspector—are working conscientiously to render fair recommendations and responses. That effort notwithstanding, however, there continue to be tendencies to accept present policies and procedures without challenge, to resolve credibility disputes uniformly against the inmate/grievant, and to shy away from some of the more intractable problems such as inappropriate staff supervision. The function of the Inspector of Institutional Services in particular is not to *process* grievances; it is to *resolve* them. He has adequate authority for this purpose and he must use that authority in spite of the fact that his decisions and recommendations will not always be met with unmitigated gratitude by other staff members including the Superintendent.

What the Special Master would suggest to all of the participants who are attempting to make the system work at Marion is that they attempt to view themselves as part of a dispute resolution rather than a quasi-judicial process. An inmate with a grievance is an inmate with a problem. The function of the Inspector, the Citizens Advisory Committee, and the Chief Inspector is to attempt to find a solution—often

an innovative one—to that problem which is consistent with the legitimate needs of the institution and the department.

Existing institutional and departmental policies and procedures are neither necessarily wise nor immutable, and the grievance procedure provides one of the few opportunities for ongoing review of those policies and procedures which may be unnecessarily restrictive without providing any corresponding benefit to the administration. If *Taylor v. Perini* has proved nothing else, it has shown that policies and procedures can change without threatening institutional order. Jobs can be assigned on a fair and nondiscriminatory basis without creating chaos; discipline can be maintained without confining a naked man on a concrete floor in a cell without a toilet; the exclusion of "Playboy" and "Penthouse" is not an essential element of the rehabilitative process.

Open-mindedness, objectivity, and a willingness to consider all sides of a problem will produce a grievance system capable of dealing with the full range of problems which led to this protracted litigation as well as with others which could trigger future judicial intervention. What is even more important, an effective and fair grievance procedure can contribute in a unique and constructive manner to the process of resocialization of inmates which is the chief objective of the correctional process.

The parties to this litigation themselves have recognized the central importance of the maintenance of an effective inmate grievance system in the proposed Agreement and Order. No motion to show cause for civil contempt for any violation of the Court's final order will be entertained by the Court unless the alleged violation has been filed as a grievance and appealed (with or without outside review) to the Chief Inspector. Under this proposed procedure, the Inspector of Institutional Services, the members of the Citizens Advisory Committee, and the Chief Inspector will all have an opportunity to recommend actions to avoid the further involvement of the Court in the affairs of Marion Correctional Institution. Given the history and length of this litigation, this innovative and creative procedure should provide impetus to all concerned to maintain an effective grievance system which will respond to the legitimate needs of the inmates at M.C.I. That the plaintiffs are willing to agree to the exhaustion requirement contained in the proposed Agreement and Order reflects their confidence in the grievance system as well as credit upon all of those persons who have contributed to its implementation in Marion. In particular, the members of the Citizens Advisory Committee should be aware of the singular confidence which the inmates have expressed in the fairness and objectivity of that group—a confidence which the Special Master believes is well-placed.

In the event that the Court orders the Special Master to review the state of compliance with the Court's final order at the end of this year, special attention will be given to the operation of the grievance system. Even if instances of noncompliance with respect to the substantive provisions of the Court's final order should occur between now and the time of that review, the effectiveness of the grievance procedure in dealing with those occurrences will be the matter of central concern to the Special Master.

### CONCLUSION

On the basis of information contained in this and in previous reports, the Special Master finds that the defendants are in substantial compliance with all of the mandatory provisions of the Court's order of September 12, 1972. In addition, the Resident Councils and the inmate grievance procedure adopted by the defendants in an effort to achieve compliance with the two prohibitory paragraphs of the Court's original order are well-conceived to attain this end. The Resident Councils require substantial additional assistance and cooperation on the part of the prison's administration and staff if they are to survive, let alone deal with the wide range of problems for which they were designed; on the other

hand, all indications to date are that the new inmate grievance system is working well. With the adoption of the recommendations contained in the report of the Center for Community Justice and with continuing efforts on the part of the Inspector of Institutional Services and the Chief Inspector, the grievance system can become a model for national emulation. More to the point of this litigation, however, it can serve as assurance to the Court that the practices, policies and procedures which have resulted from *Taylor v. Perini* will remain in force in perpetuity.

The Special Master therefore makes the following recommendations to the Court:

1. That the Agreement and Order proposed by the parties be approved by the Court;

2. That the Special Master be dismissed, subject to his reviewing the state of the defendants' compliance with the Court's final order and reporting his findings to the Court by December 31, 1978, and subject to reappointment in the event that that report discloses substantial noncompliance;

3. That the services of Court appointed counsel for the plaintiffs be terminated subject to his right to respond to the contents of the Special Master's report of his review of the defendants' compliance with the Court's final order and subject to reappointment in the event that that report discloses substantial noncompliance.

Respectfully submitted,
s) Vincent M. Nathan
Special Master

## APPENDIX A

## EVALUATION OF OUTSIDE REVIEW PROCESS AT MARION CORRECTIONAL INSTITUTION *

### INTRODUCTION AND HISTORY

On May 31, Michael Lewis and Noel Brennan from the Center for Community Justice traveled to Marion, Ohio for the purpose of evaluating the outside review process of the inmate grievance procedure at the Marion Correctional Institution.

The Ohio Department of Rehabilitation and Correction has had administrative regulations governing inmate grievance procedures since 1972. In 1976, partially as a result of the litigation in *Taylor v. Perini*, 413 F.Supp. 189, N.D.Ohio, 1976, the department issued new administrative regulations altering the inmate grievance system in all of the state's adult correctional institutions. Shortly after promulgation of the new regulations, the director of the department established a Special Monitoring Committee to evaluate the revised procedures.

In August 1977, the Special Monitoring Committee issued a report based on its observations of the procedure during the period from February through June 1977. The report contained a number of recommendations, the most important of which were the following:

1. There should be a permanent external monitoring committee.

2. Independent reviewers should be appointed to assist in the settlement of grievances.

The department agreed to the first recommendation, and lent its support to a bill in the Ohio legislature establishing a monitoring committee composed of legislators. The department also agreed to try, on an experimental basis at Marion only, the use of an independent review panel. The outside reviewers, all of whom were trained in January 1978, have been providing recommendations on grievances to the department since that time.

Prior to traveling to Marion, Center staff reviewed copies of all grievances appealed to the Citizens' Advisory Committee and the respective panel responses. A copy of the outside reviewers' "Guidelines for Operation" formulated cooperatively by the Special Master and the Citizens' Advisory Committee (CAC) was also reviewed. (See Appendix for a copy of the Guidelines.)

* This report was prepared and submitted to the Special Master by the Center for Community Justice, Washington, D.C.

During the three-day visit, Center staff visited the Marion Penitentiary and met with Superintendent Perini and the Inspector of Institutional Services (IIS), Jay Tripp. Discussions were held at the institution with inmates who had used the outside review appeals level of the grievance procedure. Center staff also had the opportunity to observe several hearings held by an outside review panel. Afterward a meeting was held with outside reviewers, a group composed of local citizen volunteers. Center staff also interviewed the Special Master and his assistant. Center staff then met and discussed the outside review process with Bill Thoroman, Chief Inspector for the Department.

## FINDINGS

The current grievance procedure at Marion is comprised of three steps. An inmate with a complaint contacts the Inspector of Institutional Services. The Inspector records the complaint, investigates the facts and attempts to resolve the problem. He returns his response in writing to the inmate. If the inmate is not satisfied, he may appeal the decision of the Inspector to the outside review panel or directly to the Chief Inspector. The panel is composed of at least two, and generally three, volunteer citizens who conduct a hearing and make recommendations to the Chief Inspector within 15 days of the hearing. The Chief Inspector then has 20 days to respond to the grievance. At no point in the existing procedure does the Managing Officer formally review a complaint. In those cases in which the problem is institutional (as opposed to departmental), Center staff view this as a liability. The Managing Officer should have the opportunity to resolve those inmate grievances which are within his jurisdiction. Conceivably, issues are being appealed to outside review which could be resolved within the facility by the Managing Officer. An effective grievance procedure should be a means to provide an administrator with a steady flow of information on complaints, substance or application of policies or about the actions of particular staff within his institution. As designed, the Ohio procedure is not an effective management tool.

The operations of the internal procedure in Ohio revolve around the effectiveness of one individual, the Inspector. At Marion, he clearly has been successful in handling a large number of inmate problems. While most IIS's handle 20 to 40 complaints a month, the Inspector at Marion handles 60 to 80. One problem with reliance on one individual is that the system is only as good as that person. Also, because the Inspector works for the system, it is unlikely that he will recommend policy changes when challenges to policies arise.

The addition of outside review has definitely enhanced the credibility of the extra-institutional aspects of the Marion grievance system. As one inmate interviewed expressed it, "We now have a fair chance to have a positive recommendation made." Prior to the implementation of the outside review component, grievances were appealed directly to the Chief Inspector. Since its addition in February, 26 cases have been appealed beyond the institution. This number exceeds the total number of cases (24) appealed from Marion for the entire preceding year. These appeals have largely come from members of the Inmate Council with whom the Special Master meets. No institutional orientation for the population has occurred.

The percentage of grievances appealed to outside review is high based on the Center's past experience. In New York, New Jersey, California, South Carolina, and Kentucky between .5% and 4% of complaints filed are appealed to outside review.

A variety of issues has been carried through to the Marion Citizens' Advisory Committee. Most have been "housekeeping" rather than policy-related questions. During interviews both department personnel and the outside reviewers commented to Center staff regarding the number of appeals. Center staff feel that there are several reasons for the comparatively large number of appeals.

One reason for the number and nature of outside appeals is related to the fact that it is only at the outside review level that the inmate is provided a hearing. Center staff feel that in the absence of a credible internal hearing process, housekeeping issues will continue to be appealed regularly to outside review. Figures from other grievance systems, such as the Maryland Inmate Grievance Commission, that have no internal institutional hearing are also consistently high.

The second reason clearly has to do with the fact that the outside panels are doing an excellent job of conducting hearings. Inmates who had used the procedure confirmed this. Although not every inmate interviewed received a favorable committee recommendation, most indicated a high level of satisfaction with the process. Inmates felt that the panel members treated them fairly, that "they listened" and "asked sensible questions." Only one inmate stated that he would not use the process again.

One of the weightiest issues to reach outside review, noted by both inmates and the administration, concerned the adequacy of health services at the institution. The grievant complained that he needed fillings replaced. He had spoken with the dentist three times and, although he had been able to get his teeth cleaned, he was told that it would be months before he could receive the substantial work his teeth needed.

Based on discussions held at Marion, Center staff concluded that the outside review panel did a thorough job investigating the problem. Obviously the full-time dentist was overburdened, having to supply the dental needs of 1,300 inmates. The panel proposed an effective solution to the problem, namely that the department hire an additional part-time dentist. The department concurred and a part-time dentist was added to the medical staff of the facility.

During the Marion visit, Center staff also learned of another issue which went to outside review involving a security staff member. Line staff/inmate conflicts are often the most difficult kinds of problems to be handled by a grievance procedure. In this case an inmate complained about the language an officer used in addressing inmates to recruit some additional help in moving a heavy load of boxes.

The facts were not in question; both officer and inmate agreed on the incident. Panel members handled the problem well. The staff member involved in the dispute was cooperative with the panel. He admitted to an error and apologized publicly by posting a memo at the dorm in question.

The Inspector of Institutional Services at Marion has consistently done a thorough job of organizing the outside hearings. During the meeting with Center staff, the Citizens' Advisory Committee commented that "parties to grievances were always well prepared." It has been the Inspector's job to get inmates released from work and, when necessary, to have staff relieved of their duties to be present at a hearing. Also, given that the panelists are local business and community people, often with other demands on their time, careful planning has to have taken place in order for as many as seven people to be available for a single hearing.*

The members of the Citizens' Advisory Committee indicated that their experience as outside reviewers had been interesting and informative. As independent third parties most panelists have had no prior affiliation with the institution and were recruited as volunteers to serve several mornings a month as outside reviewers. They have successfully provided the department and inmates the unemotional perspective of a neutral party on those issues appealed to them. According to the Chief Inspector, they have aided him in responding to appeals. The reviewers have found the MCI administration supportive, and the reviewers in turn are clearly sensitive to the needs and constraints of the department.

Although the procedure is functioning relatively smoothly, the reviewers identified several problems with the current opera-

---

* The seven people include three panelists, one grievant, one respondent, and two witnesses.

tions. Addressing these issues will improve the overall effectiveness of the procedure.

### 1. *Shortage of outside reviewers*

Center staff feel that the volunteers are overworked. Because of the volume of grievances going to outside review, the pool of available panelists is no longer sufficient. The Superintendent (Managing Officer) indicated to Center staff that additional reviewers were being recruited. In order for the process to remain neutral and independent, however, the Superintendent should not have the sole voice in selecting additional outside reviewers. Also, to ensure that the credibility of the process is preserved, neither panelists nor inmates should perceive that the outside reviewers work for the Superintendent.

### 2. *Written recommendations of respective panels*

Panel recommendations need improvement. Center staff reviewed all the recommendations issued by the Marion outside review panel. Although accompanied by copies of original grievances, panel recommendations generally lack supporting statements. Seldom are reasons provided for a specific recommendation. During the hearings observed by the evaluators, it appeared that the panelists were rushed to frame recommendations. This is partly due to the fact that two hearings are scheduled for a two-hour period. Two hours may not be sufficient time for reviewers to hear the grievant's complaint, listen to witnesses, discuss possible recommendations and, finally, to write them on paper.

### 3. *Feedback to outside reviewers*

A lack of clarity exists among volunteers as to the role outside review plays in the Department of Corrections inmate grievance system. Many reviewers stated they would like to know the disposition of grievances for which hearings were held. Apparently this information is currently being sent to the chairman of the Marion Advisory Committee. As an active businessman, the chairman does not have time nor staff to distribute this feedback on a regular basis.

### 4. *"Guidelines of Operation"*

Some existing "guidelines of operation" for the Marion Citizens' Advisory Committee need alteration. Hearing times and the provision of background information as they currently exist may be crowding panelists during their reviews. When the Inspector designated the 10 o'clock hearing time, he did so to allow the volunteers sufficient time to get to the institution. Most, however, live nearby and would prefer having more time allotted to work at the institution.

### 5. *Availability of written policies and procedures*

There have been several issues for which reviewers have needed a copy of a policy and not had a rule book available. One inmate interviewed stated that a policy on which the reviewers based their recommendation was never read by the panel members, nor shown to the inmate. The inmate was frustrated because he felt his problem had not been properly addressed.

## SPECIFIC RECOMMENDATIONS OF THE CENTER FOR COMMUNITY JUSTICE

### 1. INCREASE THE POOL OF OUTSIDE REVIEWERS

This needs to be done immediately. Center staff strongly recommend that new individuals be selected and recruited either by the Special Master or the existing reviewers. New reviewers will need training and orientation to the intent and operations of the process. This can be provided through discussion with existing panelists augmented by rotation through actual hearings with experienced reviewers.

### 2. DEVISE A SYSTEM TO PROVIDE FEEDBACK TO ALL PANELISTS ON THE NATURE, NUMBER AND DISPOSITION OF GRIEVANCES APPEALED TO OUTSIDE REVIEW

This could be accomplished by the institutional Inspector's development of a monthly

summary sheet of cases which would include the Chief Inspector's disposition. The Inspector is also in a more central position than the chairman of the Advisory Committee and therefore better able to distribute the Chief Inspector's response to the respective panelists who participated in a hearing.

### 3. EXPAND THE OUTSIDE REVIEW COMPONENT OF THE INMATE GRIEVANCE PROCEDURE TO ALL OHIO INSTITUTIONS

The experiment at Marion has been effective. The outside appeals level has been used, it is seen as fair by the inmates and has actually prompted some changes. Also, based on copies of grievances and responses, it appears that more than 70% of the outside review recommendations have been accepted by the Chief Inspector.

The use of citizen volunteers has also been successful. Their recommendations have reflected an objective evaluation of an issue. They have not become inmate advocates, a position which department officials usually suspect. In fact, at Marion the panelists appear if anything too solicitous of established institutional and departmental policies.

### 4. ALTER SEVERAL EXISTING OPERATIONAL GUIDELINES

A. Hearings should commence at 9 o'clock. This will provide panel members with some of the necessary additional time in which to formulate recommendations.

B. Materials related to the day's hearing should be mailed to reviewers prior to a hearing. Although many are too busy to read background information ahead of time, the opportunity should be provided for those who can do so.

C. Reviewers must be provided with institutional and departmental rule books. Several grievances required the interpretation of an institutional policy. In the absence of the official document, panelists relied on interpretations made by institutional staff. While such testimony can be accurate, inmates often can not be persuaded of staff objectivity and want to see policy statements in writing.

### 5. ENCOURAGE OUTSIDE REVIEWERS TO FORMULATE MORE EXPANSIVE RECOMMENDATIONS

Reviewers' recommendations were the weakest aspect of the outside review process. Panelists need to state reasons for specific recommendations and to include actual statements of existing policies where necessary. Also, a meeting between the reviewers and the Chief Inspector should be held to discuss the best format for panel recommendations.

### 6. DEVELOP A CREDIBLE INTERNAL HEARING PROCESS AT MARION

If an internal neutral hearing procedure existed, fewer grievances would be appealed to an outside hearing. Most likely many of the housekeeping appeals would no longer progress to external review. For an internal review mechanism to be acceptable, it must be perceived to be impartial both by inmates and staff, and most likely must include both groups in the resolution of grievances. If an internal hearing process is devised, the Managing Officer should be added to the appeals process. Otherwise some grievances will be appealed unnecessarily beyond the institution.

### 7. PROVIDE ONGOING ORIENTATION FOR THE INMATE POPULATION TO OUTSIDE REVIEW

Presently many of the appeals come from members of the inmate council. The reason appears to be that they meet with the Special Master and have been oriented to the appeals process. The entire population needs this kind of indoctrination. Members of the inmate council should be able to meet with living units to describe the process and to answer questions. Without an ongoing orientation program the impact of the process will seriously diminish once the Special Master is no longer at the institution.

These recommendations will help improve the structure and operations of the existing inmate procedure. The Center feels strongly that by establishing credible administrative procedures the Ohio Department of Corrections and Rehabilitation can go a long way towards resolving the types of issues raised in *Taylor v. Perini.*

### APPENDIX TO EVALUATION OF OUTSIDE REVIEW PROCESS

### MARION CITIZENS' ADVISORY COMMITTEE

Guidelines of Operation:

1) Each outside review committee would consist of three (3) members. Two (2) members could represent a quorum— But no less than two (2) members.

2) Members shall be called in numerical rotation—calling the first three persons for the first Committee action. A record will be kept logging persons called and dates. These calls and records will be kept by the secretary to the Inspector of Institutional Services at Marion Correctional Institution.

3) Usually two (2) cases to be handled by each Committee action.

4) Dr. McClaskey would be media liaison and that any contacts made to other members would be referred to him, and that he would work under the direction of the Chairman.

5) Timetables of operation were:

a) Verbal (telephone) notification within two (2) working days of receipt of request asking for outside review.

b) A hearing will be within five working days of this verbal notification. If a longer period of time is necessary the Inmate will be notified.

c) No Saturday or Sunday meetings.

d) 10:00 AM as the preferred time for meetings.

e) A recommendation of the Committee action will be made within or up to fifteen (15) working days from the end of the hearing or hearings, with the possibility of a five (5) day extention. Any delay would be communicated to the Inmate in writing.

f) Carbon copies of all resolutions of Committee action will be sent to the Inmate, Chief Inspector, master file for the Marion Citizens' Advisory Committee and Mr. J. Tripp, I.I.S. at Marion Correctional.

6) The method of identification of recommendations will be as follows; 1–8–1–1 (numbers only examples). This method will incorporate the Grievance identification system used at MCI, and will facilitate cross reference. The first digit indicates the month; the second digit indicates the year; the third digit indicates MCI Grievance number; and, the final number will represent the Marion Citizens' Advisory Committee recommendation.

7) An introductory statement will be read to each person at a Committee action.

8) The word "Mister" is to be used when addressing any person before the Committee.

9) Committee recommendations can not be sent back to the Inspector. Once the Committee has taken action it can only go to the Chief Inspector.

10) Witnesses may be called in, but the Committee wants the person involved to speak for themselves.

11) Each three person Committee will designate a Spokesperson and that person will be responsible for the handwritten draft of the recommendation. The handwritten draft will have the signatures of all three members.

12) The typewritten copy of each recommendation will have a statement at the ending that will read, COMMITTEE ACTION WITH NAMES ON FILE.